ESTATE OF ROBERT E. FRANE, DECEASED, JANET M.
FRANE, PERSONAL REPRESENTATIVE, PETITIONER
*v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

JANET M. FRANE AND ESTATE OF ROBERT E. FRANE,
DECEASED, JANET M. FRANE, PERSONAL
REPRESENTATIVE, PETITIONERS *v.*
COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket Nos. 288-89, 21626-89.     Filed March 31, 1992.

*David L. Cornfeld, David T. Karzon, Jr.,* and *Donald W. Paule,* for petitioners.
*Steven W. LaBounty,* for respondent.

OPINION

NIMS, *Chief Judge:* Petitioner in docket No. 288-89 is the Estate of Robert E. Frane, deceased (the estate), Janet M. Frane, personal representative. By statutory notice of deficiency dated October 4, 1988, respondent determined a deficiency in the Federal income tax of the estate for the fiscal year ending June 30, 1985, of $103,981.42. In an amendment to answer, respondent asserted an increase in the estate's deficiency of $6,734, for a total deficiency of $110,715.42. The increased deficiency asserted by respondent is based entirely on facts stipulated by the parties.

Petitioners in docket No. 21626-89 are Janet M. Frane and the Estate of Robert E. Frane, deceased, Janet M. Frane, personal representative. By statutory notice of deficiency dated June 7, 1989, respondent determined a $103,866 deficiency in the final joint Federal income tax liability of Robert E. Frane (decedent) and Janet M. Frane for the year 1984. As will be explained below, the deficiency determined by respondent in docket No. 21626-89 is an alternative position to that asserted in docket No. 288-89.

These cases were consolidated for trial, briefing, and opinion. For convenience, the taxpayers in both cases will be referred to as petitioners throughout. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by the parties, the issues remaining for decision are: (1) Whether the estate realized income in respect of a decedent under section 691 as a result of installment obligations held by decedent for which the unpaid principal and interest owed to decedent were deemed canceled and extinguished as though paid upon his death; (2) in the alternative, whether such deemed cancellation and extinguishment of the installment obligations caused the recognition of income under section 453B which was required to be reported on the final return of the decedent and his wife; and (3) whether the 6-year period of limitations on assessment and collection under section 6501(e) is applicable to decedent's final joint income tax return.

The parties submitted these cases fully stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.

## Background

At the times of the filing of the petitions in these cases, Janet M. Frane, decedent's wife and personal representative of the estate, resided in Webster Groves, Missouri. The fiduciary income tax return (Form 1041) of the estate for the taxable year ending June 30, 1985, was timely filed with the Internal Revenue Service Center at Kansas City, Missouri. The final joint income tax return (Form 1040) of decedent and his wife for the calendar year 1984 was timely filed on April 15, 1985, with the Internal Revenue Service Center at Kansas City, Missouri.

Sometime in March 1982, decedent organized Sherwood Grove Co. (Sherwood), a Missouri corporation. At that time, decedent transferred $1,000 and 150,000 shares of common stock of Consolidated Grain & Barge Co. to Sherwood in exchange for 5,000 shares of no par value common stock of Sherwood and 89,485 shares of no par value convertible preferred stock of Sherwood.

On May 10, 1982, decedent sold 1,250 shares of common stock of Sherwood to each of his four children pursuant to separate, but identical, purchase agreements. With respect to the purchase price, each purchase agreement reads in part as follows:

> The purchase price for the shares of stock being purchased hereunder shall be the appraised fair market value of such shares as of this date, such appraisal to be made by A.G. Edwards & Sons, Inc., St. Louis, Missouri. The purchase price hereunder shall be payable in twenty (20) equal annual payments of principal and interest * * * . Such purchase price shall be represented by a promissory note of Purchaser substantially in the form attached as Exhibit A which shall be secured by a collateral pledge of such stock * * * . In addition, such note shall provide that in the event of Seller's death prior to the final payment of principal and interest under said note, the unpaid principal and interest of such note shall be deemed cancelled and extinguished as though paid upon the death of Seller.

Pursuant to the purchase agreement, on May 10, 1982, each of decedent's four children executed a promissory note in the principal amount of $141,050, wherein each child was obligat-

ed to decedent for payment of 20 equal annual installments commencing on May 10, 1983. The promissory note further required interest to be paid annually at a rate of 12 percent on any unpaid principal. The $141,050 purchase price was based upon the determination of A.G. Edwards & Sons, Inc., that such price reflected the fair market value of 1,250 shares of Sherwood common stock at the time of purchase. As required by the purchase agreement, each promissory note contained the following provision (the cancellation provision):

Unless sooner paid, all sums due hereunder, whether principal or interest, shall be deemed cancelled and extinguished as though paid upon the death of Robert E. Frane.

Also pursuant to the purchase agreement, on May 10, 1982, decedent and each of his four children executed a collateral pledge and security agreement which reads in part as follows:

WHEREAS, pursuant to a Purchase Agreement * * * Pledgee has this day sold to Pledgor 1,250 shares of the capital stock of Sherwood Grove Company * * * for the aggregate sum of * * * [$141,050]; which amount is represented by Pledgor's Promissory Note in the principal amount of [$141,050] * * * .

WHEREAS, Pledgor has agreed to secure the obligation of Pledgor under the Note and the Agreement by the assignment, pledge and delivery to Pledgee, as collateral security therefor, of Pledgor's certificate(s) representing the 1,250 shares of the Corporation's capital stock owned by Pledgor duly endorsed in blank * * * .

At the time of the sale of the Sherwood stock, decedent was 53 years of age, and his life expectancy as determined from the U.S. Department of Commerce statistics exceeded the 20-year term of the promissory notes. However, decedent died on July 15, 1984, approximately 2 years after the sale of the stock. Decedent had received two payments totaling $4,812 on each note prior to his death, leaving an unpaid principal balance on each of $136,238.

Gain from the sale of the Sherwood stock was reported on the joint income tax returns of the decedent and his wife for the years 1983 and 1984 under the installment method of accounting pursuant to section 453 and the regulations thereunder pertaining to contingent payment sales.

In 1983, decedent received a principal payment of $1,958 from each of his four children with respect to the purchase of

the Sherwood stock.  On Form 6252 (Computation of Install-ment Sale Income) attached to their 1983 joint income tax return, decedent and his wife reported $1,955 of each payment as capital gain income after applying a gross profit ratio equal to .9982270 (see sec. 15A.453-1(b)(2)(i), Temporary Income Tax Regs., 46 Fed. Reg. 10709 (Feb. 4, 1981)).

In 1984, decedent received a principal payment of $2,854 from each of his four children with respect to the purchase of the Sherwood stock.  On Form 6252 attached to their 1984 joint income tax return, decedent and his wife reported $2,849 of each payment as capital gain income after applying a gross profit ratio of .9982270.  On part II of Schedule D (Capital Gains and Losses) attached to their 1984 return, decedent and his wife also reported a long-term capital loss totaling $964. The capital loss was based upon a recomputation of the gross profit ratio pertaining to the four promissory notes.  The 1984 return did not disclose (1) the recomputed gross profit ratio (or the reasons for the recomputation), (2) the calculations underlying the claimed capital loss, (3) the fact that the capital loss was attributable to the sale of the Sherwood stock, or (4) that no further payments were due under the notes.  No other information with respect to the notes and transaction in question was reported in the 1984 return.

On its Federal estate tax return, the estate disclosed the promissory notes in question but did not include any balance due in respect thereof in decedent's gross estate.  Respondent audited the estate tax return and issued a closing letter without making any adjustments to decedent's gross estate with respect to any balance due under the promissory notes.

On its Form 1041 for the taxable year ending June 30, 1985, the estate did not report any gain attributable to the promisso-ry notes held by decedent at his death.

Sherwood was liquidated in December 1986.  Two of decedent's children reported long-term capital losses from the disposition of their Sherwood stock in connection with Sher-wood's liquidation.  In computing their claimed capital losses, each child reported a basis for the Sherwood stock equal to the principal amounts actually paid, $4,812.  Decedent's two other children did not report any gain or loss attributable to the liquidation of Sherwood.

*Discussion*

These cases present us with a straightforward question of statutory analysis concerning the income tax consequences of installment obligations held by decedent for which, under the express terms of the obligations, all unpaid principal and interest owed to decedent were deemed canceled and extinguished as if paid upon his death.

As a preliminary matter, we note that respondent has characterized the type of transaction under consideration as a "death-terminating installment sale" or a "self-canceling installment note". While generalizations are sometimes helpful, our analysis in these cases is solely based upon the specific facts before us.

It is also important to note that both parties agree that the sale of the Sherwood stock by decedent to his children qualified as an installment sale under section 453 and that the obligations to pay decedent are "installment obligations" as that term is commonly used in the context of section 453. In short, respondent has not attempted to recharacterize the payments received by decedent in any way, nor has she challenged the adequacy of the consideration received by decedent for the Sherwood stock.

Respondent advances two arguments in support of her position that gain must be recognized as a consequence of the cancellation of all outstanding payments under the installment obligations. Respondent first asserts that because of the cancellation provision contained in each of the promissory notes, the estate recognized gain under section 691 and was required to report such gain on its fiduciary income tax return. See Rev. Rul. 86-72, 1986-1 C.B. 253. Specifically, respondent asserts that due to the cancellation provision, the installment obligations owed to decedent were canceled or became unenforceable as contemplated under section 691(a)(5). Respondent therefore concludes that the estate is deemed to have transferred such obligations, resulting in taxable gain under section 691(a)(2).

Respondent alternatively argues that by reason of the cancellation provision the installment obligations owed to decedent were canceled or otherwise became unenforceable as contemplated by section 453B(f). Respondent concludes that as a consequence taxable gain must be recognized under section

453B(a) and reported on decedent's final joint income tax return. In this regard, respondent asserts that the 6-year period of limitations on assessment and collection under section 6501(e) applies to decedent's final joint income tax return.

With respect to respondent's first argument, petitioners counter that decedent's death did not cause the unpaid balance of the installment obligations owed to him to become taxable under section 691. Rather, petitioners argue the obligations were "extinguished" by decedent's death, and thus no obligation survived his death to be canceled or transferred within the meaning of sections 691(a)(2) and (5). Similarly, in regard to respondent's alternative position, petitioners argue that the installment obligations owed to decedent were neither canceled nor otherwise became unenforceable within the meaning of section 453B(f). Petitioners also contend that the 6-year period of limitations under section 6501(e) is inapplicable because there was adequate information disclosed in their return to apprise respondent of the nature and amount of the omission from gross income. See sec. 6501(e)(1)(A)(ii).

Before we consider the competing claims, so to speak, of the decedent's final return and the estate's first return, we first consider the question of whether in any event income was recognized by reason of the deemed cancellation and extinguishment to which we have referred.

Section 453B(a) provides in part:

SEC. 453B(a). GENERAL RULE.—If an installment obligation is satisfied at other than its face value or distributed, transmitted, sold, or otherwise disposed of, gain or loss shall result to the extent of the difference between the basis of the obligation and—

*   *   *   *   *   *   *

(2) the fair market value of the obligation at the time of distribution, transmission, or disposition, in the case of the distribution, transmission, or disposition otherwise than by sale or exchange.

Thus, under section 453B(a)(2), if an installment obligation is either (1) distributed, (2) transmitted, or (3) disposed of in a transaction other than a sale or exchange, gain or loss will be recognized. The amount of gain or loss recognized is equal to the difference between the basis of the installment obligation, see sec. 453B(b), and its fair market value at the time of the transaction.

Section 453B(f) provides as follows:

SEC. 453B(f). OBLIGATION BECOMES UNENFORCEABLE.—For purposes of this section, if any installment obligation is canceled or otherwise becomes unenforceable—

    (1) the obligation shall be treated as if it were disposed of in a transaction other than a sale or exchange, and

    (2) if the obligor and obligee are related persons (within the meaning of section 453(f)(1)), the fair market value of the obligation shall be treated as not less than its face amount.

Thus, any installment obligation which is canceled or otherwise becomes unenforceable shall be treated as if it was "disposed of in a transaction other than a sale or exchange". An installment obligation which is disposed of in a transaction other than a sale or exchange, in turn, is subject to tax under section 453B(a)(2) to the extent the obligation's fair market value at the time of the transaction exceeds basis. If the obligor and obligee are related persons within the meaning of section 453(f)(1) (e.g., parent and child), then the fair market value of the installment obligation for purposes of calculating the gain shall be no less than its face amount.

The facts of the present case fall squarely within section 453B(f). The promissory notes executed by decedent and his four children state:

Unless sooner paid, all sums due hereunder, whether principal or interest, shall be deemed *cancelled and extinguished as though paid upon the death of Robert E. Frane.* [Emphasis added.]

Pursuant to the express terms of this provision, the children's installment obligations to pay decedent were canceled upon decedent's death. Section 453B(f) explicitly provides that the cancellation of an installment obligation shall be treated as a taxable disposition of such obligation.

Petitioners, however, contend that the above provision was a "contingency" affecting the total purchase price to be paid for the stock. According to petitioners, the total purchase price to be paid for the stock depended upon whether decedent lived beyond the 20-year term of the promissory notes. In conjunction with the foregoing, petitioners posit that the term cancellation means "To destroy the force, effectiveness, or validity of. To annul or abrogate", quoting Black's Law Dictionary 187 (5th ed. 1979). Petitioners thus conclude that because the occurrence of the contingency (decedent's death) extinguished the children's obligations under the promissory

notes by reducing the purchase price to be paid, the promissory notes were neither canceled nor otherwise became unenforceable within the meaning of section 453B(f).

Petitioners' assertion that the total purchase price to be paid for the stock was contingent upon decedent's death is unsupported by the facts before us. A contingent payment sale is defined as a sale or other disposition of property in which the aggregate selling price cannot be determined by the close of the taxable year in which such sale or disposition occurs. Sec. 15A.453-1(c)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981). In contrast to this definition, the aggregate purchase price to be paid for the Sherwood stock was determinable at the time of the sale.

Each purchase agreement executed by decedent specifically states that the purchase price for the shares of the stock shall be the appraised fair market value as determined by A.G. Edwards & Sons, Inc. The parties stipulated that pursuant to such appraisal, the fair market value for each block of stock was $141,050. The purchase agreement also specifically states that such purchase price shall be represented by the promissory note and secured by a collateral pledge agreement. Each promissory note was made in the amount of $141,050. Moreover, each collateral security pledge states that decedent sold the stock "for the aggregate sum of * * * [$141,050]; which amount is represented by Pledgor's Promissory Note in the principal amount of [$141,050]".

The language of the cancellation provision itself demonstrates the weakness in petitioners' argument. According to petitioners, "The import of this sentence is that upon Mr. Frane's death the Promissory Notes were treated as though they were fully paid in accordance with their terms." As so viewed, by treating the unpaid principal amount as being "fully paid", decedent's death in no way reduced the total agreed purchase price, $141,050. On the contrary, by treating the unpaid principal as being fully paid, the children's obligation to repay the remaining principal balance was canceled by decedent's death pursuant to the express terms of the cancellation provision. Therefore, decedent's death was not a "contingency" affecting the total purchase price of the stock.

We likewise reject petitioners' narrow view of the meaning of the term "canceled". While section 453B(f) does not contain

a definition, it also does not contain any pertinent qualifying or limiting language. There is nothing in the statute that indicates anything other than that the common usage of the term "canceled" should be applied. Whether the term "canceled" is defined as to annul, abrogate, terminate, discharge, extinguish, or by any other synonym, given the broad sweep and explicit language of the statute, if section 453B(f) is to have any application at all, the term "canceled" must include any cessation of an obligation to pay that would otherwise continue to exist.

Our interpretation of section 453B(f) is fully supported by the legislative history. Section 453B(f) was enacted by the Installment Sales Revision Act of 1980, Pub. L. 96-471, 94 Stat. 2247, 2253. The Senate Finance Committee report accompanying section 453B(f) reads as follows:

M.  Cancellation of Installment Obligation (sec. 2 of the bill and new sec. 453B(f) of the Code)

### Present law

Under present law, some have argued that the installment obligation disposition rules can be avoided by making gift cancellations of the obligation or the installments as they come due. In other words, by making an installment sale and then cancelling the obligation or a number of installment payments, it is argued that the seller will incur no income tax liability, but possibly some gift taxes, and the buyer will have a cost basis in the property sold although no income tax cost will have been incurred on the transaction. If a direct gift is made, the donee's basis is generally the same as the donor's basis rather than a "cost" basis which reflects future payments which will never be made.

This cancellation technique is based on a District Court's decision in *Miller v. Usry.* [160 F. Supp. 368 (W.D. La. 1958).] In that case, the court held that the disposition rules for obligations disposed of other than by sale or exchange were directed at corporate transfers and should not be applied to a cancellation of the obligation where there has been no actual, real, or material gain to the taxpayer. The court did not consider the possible benefit to the donee from acquiring a cost basis through the installment sale. Next, the court held that the disposition rules for satisfaction at other than face value did apply to a cancellation but no tax was incurred because no amount was realized by the taxpayer.

### Reasons for change

The committee believes that present law should be clarified to make it clear that the installment obligation disposition rules cannot be circumvented by cancelling the obligation.

*Explanation of provision*

The bill makes it clear that the cancellation of an installment obligation is treated as a disposition of the obligation. * * *
[S. Rept. 96-1000, at 25-26 (1980), 1980-2 C.B. 494, 507-508.]

It is evident from the above language that the congressional purpose in enacting section 453B(f) was to make clear that any cancellation of an installment obligation should be treated as a disposition of that obligation. See *American Offshore, Inc. v. Commissioner,* 97 T.C. 579, 600 (1991). It is equally clear from the above language that the focus of section 453B(f) is whether the obligation has been canceled. Consistent with the language of the statute, there is no limiting language in the legislative history concerning the meaning of the term "cancellation". Congress enacted section 453B(f) to make it clear that the installment obligation disposition rules cannot be circumvented by canceling the obligation. S. Rept. 96-1000, *supra* at 26, 1980-2 C.B. at 507-508. In short, Congress intended that when income is deferred under the installment method, a cancellation of the obligation cannot prevent the remaining unreported income from being recognized under the installment obligation disposition rules.

Petitioners assert that Congress intended section 453B(f) only to be applicable to the cancellation technique in *Miller v. Usry,* 160 F. Supp. 368 (W.D. La. 1958), referred to in the Senate Finance Committee report. We find no support for petitioners' assertion either in the statute or the above-quoted legislative history. While it is certainly true that Congress intended to legislatively overrule the decision in *Miller,* see *American Offshore, Inc. v. Commissioner, supra,* Congress did not limit the application of section 453B(f) only to the exact *Miller* facts. Nor did Congress limit the application of section 453B(f), as petitioners assert, to situations where the buyer may get a full cost basis even though the full purchase price was not paid due to the cancellation. We therefore decline to create such limitations on the applicability of section 453B(f) where Congress has not done so.

Petitioners next assert that even if the installment obligations were canceled under section 453B(f), the resulting transmission of the obligation at decedent's death falls outside the scope of section 453B by reason of section 453B(c).

Section 453B(c) provides that if an installment obligation is "transmitted" at death, then except as provided under section 691, section 453B shall not apply to such transmission. As previously indicated, section 453B(a)(2) provides that if an installment obligation is either (1) distributed, (2) transmitted, or (3) disposed of in a transaction other than a sale or exchange, gain or loss will be recognized. When an installment obligation is canceled, section 453B(f)(1) provides that such obligation is treated as if it were "disposed of in a transaction other than a sale or exchange", the third type of disposition event under section 453B(a)(2). In contrast, section 453B(c) specifically limits its application to an obligation that is transmitted at death, the second type of disposition event under section 453B(a)(2). Thus, because section 453B(f) specifically treats the cancellation of an installment obligation as a disposition other than a sale or exchange, section 453B(c) cannot by its own terms apply to a transaction governed by section 453B(f), there having been a disposition rather than a transmission of the installment obligation.

Petitioners lastly assert that even if section 453B(f) is applicable, no gain was recognized because the face amount of the promissory notes at the time of decedent's death was zero. Respondent contends that at the time of the cancellation the face amount of each note was equal to the unpaid principal that was canceled.

Section 453B(f) treats the cancellation of an installment obligation as a taxable disposition under section 453B(a)(2). For purposes of measuring the recognized gain, section 453B(a)(2) looks to the fair market value of the installment obligation "at the time of" the disposition. When an installment obligation is canceled, section 453B(f) provides that where, as here, the obligor and obligee are related persons within the meaning of section 453(f)(1), the fair market value of the installment obligation for purposes of calculating the gain shall be no less than its face amount. Therefore, under this statutory framework the fair market value of the installment obligations under consideration is the face amount of the notes at the time of the cancellation.

Petitioners' focus on the face amount of the obligation following the cancellation is misplaced. Under petitioners' theory there would never be any gain recognized when an

installment obligation between related parties is canceled. Such a result is certainly not contemplated by the statute. Rather, the face amount of the obligations at the time they are canceled must be equal to the remaining unpaid principal amount that would have been paid had the obligation not been canceled (i.e., the amount realized from the cancellation). Cf. *Commissioner v. Tufts,* 461 U.S. 300, 313 (1983).

Accordingly, based on the foregoing analysis we hold that the installment obligations held by decedent were canceled within the meaning of section 453B(f). As a result, each installment obligation is treated as if it were disposed of in a transaction other than a sale or exchange by decedent. Sec. 453B(f)(1). Further, because the obligor (each of decedent's children) and the obligee (decedent) are related, gain was recognized equal in amount to the excess of the face amount of the obligations over basis "at the time of" the transaction—the date of decedent's death. Sec. 453B(a)(2), (f)(2). The face amount of each installment obligation is equal to the remaining unpaid principal amount which was canceled.

Section 691(a)(1) provides in part:

SEC. 691(a). INCLUSION IN GROSS INCOME.—

(1) GENERAL RULE.—The amount of all items of gross income in respect of a decedent *which are not properly includible in respect of the taxable period in which falls the date of his death or a prior period* * * * shall be included in the gross income, for the taxable year when received, of:

(A) the estate of the decedent, if the right to receive the amount is acquired by the decedent's estate from the decedent * * *

[Emphasis added.]

In essence, section 691(a)(1)(A) provides that "all items of gross income *not properly includible in the decedent's [final income tax] return* * * * [as] determined under the method of accounting employed by him" acquired by the estate from the decedent will be taxable to the estate when received. *Poorbaugh v. United States,* 423 F.2d 157, 160 (3d Cir. 1970) (emphasis added); sec. 1.691(a)-1(b), Income Tax Regs. Thus, section 691(a)(1) does not apply to those items of gross income of decedent which are properly includable in his final income tax return. See *Estate of Peterson v. Commissioner,* 74 T.C. 630, 638 (1980), affd. 667 F.2d 675 (8th Cir. 1981); *Estate of Sidles v. Commissioner,* 65 T.C. 873, 879 (1976), affd. without published opinion 553 F.2d 102 (8th Cir. 1977); see also S.

Rept. 1631, 77th Cong., 2d Sess., 1942-2 C.B. 504, 580; 3 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 83.1, at 83-1-83-5 (2d ed. 1991); Ferguson et al., Federal Income Taxation of Estates and Beneficiaries 146 (1970).

Since our foregoing analysis has led us to conclude that the installment obligations were canceled within the meaning of section 453B(f) and therefore that gain was recognized under section 453B(a) at decedent's death, it follows that section 691(a) is not implicated in this case. The amounts of the items in question are not "items of gross income in respect of a decedent". They are, instead, items which are properly included in respect of the taxable period in which falls the date of decedent's death, and we so hold. By doing so we reject respondent's primary position based upon section 691 and accept instead her alternative position based upon section 453B.

We now turn to the issue of whether the 6-year period of limitations on assessment and collection under section 6501(e) is applicable to decedent's final joint income tax return.

The final joint income tax return for decedent and his wife for the calendar year 1984 was filed on April 15, 1985. The 3-year period of limitations on assessment and collection with respect to this return expired on April 15, 1988. See sec. 6501(a). Respondent, however, mailed the notice of deficiency pertaining to petitioners' 1984 return on June 7, 1989, approximately 4 years after the return was filed. As a consequence, if the 6-year period of limitations under section 6501(e) is not applicable, the notice of deficiency is untimely.

Section 6501(e)(1)(A) provides for a 6-year period of limitations on assessment and collection where there is an omission of more than 25 percent of the gross income stated in the return. Petitioners agree that any gain attributable to the cancellation of the installment obligations under section 453B exceeds 25 percent of the gross income reported in the return. Petitioners assert, however, that because there was adequate information disclosed in their return to apprise respondent of the nature and amount of any omission from gross income, under section 6501(e)(1)(A)(ii) such amount is not taken into account in determining whether the 6-year period is applicable.

Section 6501(e)(1)(A)(ii) provides that in determining whether there was an omission of gross income that exceeded 25 percent of the gross income reported in the return—

there shall not be taken into account any amount which is omitted from gross income stated in the return *if such amount is disclosed in the return, or in a statement attached to the return, in a manner adequate to apprise the Secretary of the nature and amount of such item.* [Emphasis added.]

To avoid the application of the 6-year period of limitations, section 6501(e)(1)(A)(ii) requires a statement (i.e., disclosure) in the return that produces a "clue" with respect to the omission of gross income. *Colony, Inc. v. Commissioner,* 357 U.S. 28, 36 (1958). The statement containing the clue does not have to be a detailed revelation of every fact underlying the transaction. *University Country Club, Inc. v. Commissioner,* 64 T.C. 460, 470 (1975); *Quick Trust v. Commissioner,* 54 T.C. 1336, 1347 (1970), affd. 444 F.2d 90 (8th Cir. 1971). The statement must, however, be sufficiently detailed to apprise respondent and her agents as to the nature and amount of the transaction so that a decision as to whether to select the return for audit may be a reasonably informed one. *Estate of Fry v. Commissioner,* 88 T.C. 1020, 1023 (1987); *University Country Club, Inc. v. Commissioner, supra* at 469. See also *Benderoff v. United States,* 398 F.2d 132, 137 (8th Cir. 1968).

Petitioners point to the following information disclosed in their return to support their position: (1) Schedule D (Capital Gains and Losses) attached to the return stated that the gross profit ratio was recomputed, which resulted in a long-term capital loss totaling $964; (2) Form 6252 and attached statements included the original gross profit from the sale of the Sherwood stock, the original gross profit ratio of .9982270, and the reported gains for 1983 and 1984; and (3) the date of decedent's death was disclosed on the face of the return. Petitioners assert that this information was adequate to apprise respondent that they omitted from gross income the remaining unpaid principal under the promissory notes and would not thereafter report any further gain with respect to the sale of the Sherwood stock. We are not so persuaded.

The information alluded to by petitioners is insufficient to support a conclusion that the amount of the omitted item of gross income was disclosed "in a manner adequate to apprise the Secretary of the nature and amount of such item" as is

required by the statute. The schedules and attachments failed to show that the recomputation of the gross profit ratio and resulting claimed capital loss were based upon the fact that petitioners were taking the position that no further payments were due under the promissory notes because of decedent's death. Although the date of decedent's death was listed on the face of the return, nowhere on the return was it disclosed that the sales of the Sherwood stock in exchange for the install-ment notes were transactions of decedent alone. Thus, the fact of decedent's death could not apprise respondent as to whether any further payments were to be received under the install-ment notes. Moreover, the 1984 return did not disclose (1) the recomputed gross profit ratio (or the reasons for the recomp-utation), (2) the calculations underlying the claimed capital loss, (3) the fact that the capital loss was attributable to the sale of the Sherwood stock, or (4) that no further payments were due under the notes. No other information with respect to the notes and transaction in question was reported in the 1984 return.

We cannot conclude, as petitioners urge, that the claimed capital loss due to a recomputed gross profit ratio is sufficient to provide respondent with a clue that the installment obliga-tions pertaining to the sale of the Sherwood stock were canceled. Petitioners did not disclose that the recomputed gross profit ratio and the claimed capital loss related in any way to the sale of the Sherwood stock reported on the Form 6252. In this connection, on the Form 6252 and attached statements petitioners disclosed the same gross profit amount from the sale of the Sherwood stock and the same gross profit percentage that they reported in 1983. Petitioners then carried the reportable gain under each installment note to Schedule D. Thus, petitioners reported the capital loss attributable to a recomputed gross profit ratio together with the capital gain attributable to the sale of the Sherwood stock on Schedule D without any further information or explanation.

In our view, petitioners' reporting of the transaction in question is quite confusing and misleading when considered in the context of section 6501(e)(1)(A)(ii). This is particularly true given the fact that a recomputation of a gross profit ratio does not automatically lead to a conclusion that no further payments are due under an installment obligation. See sec.

15A.453-1(c)(2), Temporary Income Tax Regs., 46 Fed. Reg. 10712 (Feb. 4, 1981).

In short, petitioners failed to provide any pertinent information in their return concerning the treatment of the installment obligations to provide respondent with a clue as to the omission of income in question. Accordingly, we hold that there was no adequate disclosure within the meaning of section 6501(e)(1)(A)(ii), and thus the 6-year period of limitations under section 6501(e) is applicable to decedent's final joint income tax return.

To reflect the foregoing and concessions,

*Decisions will be entered under Rule 155.*

Reviewed by the Court.

PARKER, SHIELDS, HAMBLEN, COHEN, CLAPP, SWIFT, JACOBS, GERBER, WRIGHT, PARR, WELLS, RUWE, and COLVIN, *JJ.,* agree with the majority opinion.

---

HALPERN, *J.,* dissenting. Apparently sensing some abuse that it must address (but does not identify), the majority concludes that an obligation that never came into being was somehow canceled. That conclusion is based on an interpretation of the word "canceled" that comports neither with common usage nor with the intent of Congress. Therefore, I dissent.

As the majority has stated, the type of transaction under consideration is commonly referred to as either a "death-terminating installment sale" or "self-canceling installment note" (SCIN). For convenience only, I will hereinafter identify the transaction by the acronym SCIN.

*The Nature of a SCIN*

Before addressing the majority's opinion, it may be best to sort out the economic relationships inherent in a SCIN. From the majority opinion we know the following: the SCIN's here in question were received in consideration for the sale of property. Respondent has not challenged the adequacy of that consideration. The property purchased was to be paid for in

installments, but no payment was to be made following the death of the seller. From those facts, the following economic relationships emerge: the seller, in a real sense, financed the sale and, thus, must be viewed as a lender, receiving repayments of principal and earning (and receiving) interest. He also agreed to accept the economic risk that he would die before the amount lent (the purchase price of the property) was repaid. He was thus an insurer (or perhaps a gambler), and earned (and received) a risk premium. Despite earning a risk premium, however, decedent for tax purposes reported payments on the SCIN's only as interest and section 453 installment payments (that is, as loan repayments), and respondent has accepted those characterizations. See majority op. pp. 344-345. So must we. Nevertheless, it is clear that, pursuant to the agreements with his children, decedent was to be compensated for bearing the risk that, if he died prematurely, no payment obligation would arise thereafter.

### The True Nature of the "Obligations" of Decedent's Children

Notwithstanding that the parties to the SCIN's failed to separately identify the risk premium earned by decedent, the sale agreements between decedent and his children did not provide for an absolute right to payments totaling $141,050. Of course, each such agreement provided for the *possibility of payments totaling $141,050.* It was clear to all from the start, however, that there might or might not come into being an obligation to make some or all of the 20 potential payments. It is also clear that decedent, *from the beginning,* bore the risk that some or all of the potential payments would not be made. No obligation to make any payment was canceled here because, excepting those payments actually made, no obligation to make additional payments ever arose. That is the crucial aspect of the agreements in question, and the aspect about which the majority and I fundamentally disagree.

### The Majority's Consideration of the Definition of "Contingent Payment Sale"

The regulations lend no support to the majority's interpretation of the children's obligations. The majority observes that a "contingent payment sale", as defined in section 15A.453-1(c)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb.

4, 1981), is limited to a sale (or other disposition) of property in which the aggregate selling price cannot be determined by the close of the taxable year in which such sale (or other disposition) occurs. Accordingly, the majority observes that—insofar as the purchase price for the stock was determinable at the time of the sales here at issue—those sales do not qualify as "contingent payment sales", as that term of art was just defined. However, that observation, correct yet irrelevant, does not demonstrate that the potential payments that decedent might otherwise have received (had he lived) were not contingent. The purpose of section 15A.453-1(c)(1), Temporary Income Tax Regs., *supra,* is not to define whether a payment is or is not contingent. The purpose is twofold: (1) To determine whether an installment sale has occurred, and not some other type of transaction, such as a contribution to a partnership, where the transferor's ultimate reward is uncertain and may, in some sense, be described as contingent; (2) to provide rules for allocating basis to payments received in contingent payment sales. If the temporary regulation, instead of using the phrase "contingent payment sale" used the phrase "qualifying contingent payment sale", it would be clear that where, as here, qualification for installment treatment is not at issue (respondent has conceded that issue) the temporary regulation is inapposite. Despite the regulation's somewhat inexact wording, it is clear, nonetheless, that it deals with nothing more than questions of qualification for installment sale treatment and basis recovery and has no relevance to the characterization of a right to payment as contingent or absolute. Moreover, it is highly doubtful that the regulation would be valid if it purported arbitrarily to limit the meaning of the word "contingent" in the manner suggested by the majority.

Clearly, decedent and his children *could have* chosen to structure their transactions as simple sales of stock for specific, noncontingent rights to payment. However, they did not do so. All parties to the transactions knew that the purchasers of decedent's stock (decedent's children) *might or might not* be obligated to make some or all of the 20 potential payments. The assertion that the purchasers of decedent's stock were unequivocally obliged to make all 20 potential payments is indefensible. Yet that assertion is necessary to

the majority's argument: for an obligation can only be canceled if it first arises. If the support the majority draws from section 15A.453-1(c)(1), Temporary Income Tax Regs., *supra,* is illusory there is no support for the majority's view that (1) at decedent's death, decedent's children were subject to an obligation to make further payments and (2) such (nonexistent) obligation was somehow canceled.

### *The Majority's Reliance on the Parties' Inaccurate Description of Their Transaction*

The majority relies heavily on decedent's and his children's characterization of the transaction, as opposed to the obvious nature of that transaction itself. The promissory notes executed by decedent and his four children state:

> Unless sooner paid, all sums due hereunder, whether principal or interest, shall be deemed cancelled and extinguished as though paid upon the death of Robert E. Frane.

According to the majority:

> *The language of the cancellation provision itself demonstrates the weakness in petitioners' argument.* * * * As so viewed, by treating the unpaid principal amount as being "fully paid", decedent's death in no way reduced the total agreed purchase price, $141,050. On the contrary, by treating the unpaid principal as being fully paid, the children's obligation to repay the remaining principal balance was canceled by decedent's death pursuant to the express terms of the cancellation provision. Therefore, decedent's death was not a "contingency" affecting the total purchase price of the stock. [Majority op. p. 349; emphasis added.]

Thus, by relying on the language of the so-called cancellation provision, the majority suggests that if the language of the promissory notes (between decedent and his children) were different, it would reach a different conclusion. Let us pursue the majority's argument. Suppose that, instead of the above provision, the promissory notes each contained the following language.

THE PARTIES INTEND THIS TO BE A CONTINGENT PAYMENT SALE. The purchase price of the stock is variable, and will be somewhere between $0 and $141,050, depending upon how long seller lives. A condition precedent to each contingent payment is that seller be alive on the scheduled potential payment date. Consequently, if seller dies before any scheduled potential payment, the obligation to make such payment does not come into existence.

In my hypothetical, the majority would be hard pressed persuasively to argue that the obligations of decedent's children to make payments subsequent to decedent's death (1) were not contingent, (2) arose, and (3) were thereafter canceled. Yet, how does the bargain represented by the hypothetical differ in any relevant respect from the bargain decedent and his children actually made? I contend that it does not. The logical and practical meaning of each bargain is simply that, if decedent dies, his children will not be obligated to make additional payments. Both bargains are, in substance, the same. By arguing that those bargains should be treated differently (when they are in fact the same), the majority has abandoned its role as interpreter of the law. It has accepted the words of the contract as a representation of facts, giving rise to an estoppel, rather than a mere statement of opinion about the transaction's legal status, which a court has a duty to reject if it believes such opinion is incorrect.[1] As a Court of Appeals so aptly put it: "One should not be garroted by the tax collector for calling one's agreement by the wrong name." *Pacific Rock & Gravel Co. v. United States,* 297 F.2d 122, 125 (9th Cir. 1961). The nature of the agreement between decedent and his children is at odds with the label those parties put upon it.[2] We should not neglect our duty to be the

---

[1]See 1 Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 4.4.6 (Attempts by Taxpayers to Restructure Transactions) (2d ed. 1989).

[2]The majority might contend that the "strong proof" doctrine supports its position. This Court has held that where a taxpayer has entered into a written agreement providing for specific terms, the tax consequences of which are at issue, strong proof must be adduced by the taxpayer seeking to establish a position at variance with the language of the agreement. See *Peterson Machine Tool, Inc. v. Commissioner,* 79 T.C. 72, 81 (1982), affd. 54 AFTR 2d 84-5407, 84-2 USTC par. 9885 (10th Cir. 1984); *Lucas v. Commissioner,* 58 T.C. 1022, 1032 (1972). Under that doctrine, the Court must determine whether the term in question "was in fact intended as a part of the contract, and also whether it had an independent economic significance in the agreement such that we might conclude it was a separately bargained-for element thereof." *Lucas v. Commissioner, supra* at 1032-1033.

First, it should be noted that the strong proof doctrine does not apply where, as here, the taxpayer does not attempt to vary the terms of the contract, as written, but merely to construe those terms. *Smith v. Commissioner,* 82 T.C. 705, 714 (1984); *Peterson Machine Tool, Inc. v. Commissioner, supra* at 82; *Molasky v. Commissioner,* T.C. Memo. 1988-173, affd. in part, revd. in part, and remanded 897 F.2d 334 (8th Cir. 1990). In the present case, petitioners do not argue that the so-called cancellation clause was not part of the bargain between decedent and his children; they simply contend that respondent's interpretation of that provision is incorrect. Second, even if the strong proof doctrine were applicable, it would not support the majority's position. Neither decedent nor his children would have bargained for the so-called cancellation provision, as an alternative to the above hypothetical provision, because, as observed earlier, the rights and obligations of the parties would have been the same under each. Therefore, the so-called cancellation provision, as interpreted by the majority, clearly lacks "independent economic significance in the agree-

arbiters of the law by allowing respondent to garrote petitioners because the parties to the transaction called their contingent payment sale by the wrong name.

The majority argues that "if section 453B(f) is to have any application at all, the term 'canceled' must include any cessation of an obligation to pay that would otherwise *continue to exist.*" Majority op. p. 350 (emphasis added). I agree. All I would require is that an obligation *begin to exist* before its cessation constitute a cancellation. The majority today holds that an obligation that never came into existence was somehow canceled. I cannot conceive of the cancellation of a nonexistent obligation. The majority thus uses the term "cancellation" in a sense that comports with neither any common use of the term nor the legislative history of section 453B(f).

## *The Meaning of the Term "Canceled"*

"Cancel" is a legal term of art that, when used in connection with a contract, obligation, or instrument, means to annul it or do away with its terms and conditions prior to performance.[3] The result of a cancellation is something at odds with, or inconsistent with, the terms of the contract, obligation, or instrument canceled. To end a contract in a manner inconsistent with its terms is the difference that distinguishes a cancellation from other words of art describing the termination of a contract. Where payments under a contract are contingent, the cessation of payments upon the occurrence of the contingency is in no way inconsistent with the terms of the contract. Thus, the contingent obligation to make payments

---

ment such that we might conclude it was a separately bargained-for element thereof." *Lucas v. Commissioner, supra* at 1032-1033. Any reliance upon the strong proof doctrine would be misplaced.

[3]See, e.g., *Metropolitan Property & Liability Ins. Co. v. Commonwealth,* 509 A.2d 1346, 1348 (Pa. Commw. Ct. 1986) ("Cancellation" of a contract "is a form of prospective relief, affecting the future rights and obligations of the parties towards each other."), affd. 535 A.2d 588 (Pa. 1987); *Jazlowiecki v. Nicoletti,* 387 A.2d 1081, 1082 (Conn. Super. Ct. 1977) ("To 'cancel' an instrument means to blot it out, to set at naught the provision of the instrument canceled, to declare it void and to do away with an existing agreement."); *Horvine v. Greencastle Production Credit Association,* 505 N.E. 2d 802, 805 (Ind. Ct. App. 1987) ("The Cancellation of a contract means that portion of the contract remaining unperformed is abrogated."). See generally 6 Words and Phrases, Cancel; Cancellation (1966). See Black's Law Dictionary 206 (6th ed. 1990) ("To destroy the force, effectiveness, or validity of. To annul, abrogate, or terminate. Defacement or mutilation of instrument. Words of revocation written across instrument."). Cf. Uniform Commercial Code sec. 2-106(3) and (4) (1989) ("termination" and "cancellation" defined and contrasted, but each occurring when a party puts an end to a contract prematurely).

under a contract may well be described as having been satisfied when, upon the happening of the contingency, no further obligation exists; the happening of the contingency does not, however, in a legal sense, cancel the obligation, since, under the terms of the contract, no further obligation comes into existence. Here, on the death of decedent, pursuant to the terms of the SCIN's held by him, any obligations of the makers thereof had been satisfied. Those obligations were not abrogated in advance of performance because no further performance was called for. The obligations had been satisfied by payment of all that under those obligations was (or would ever become) due. Thus, unless Congress intended the term "canceled" to have some extraordinary and novel meaning, the debt in question (represented by the SCIN obligations) was satisfied, and was not canceled.[4]

## The Legislative History

### No Evidence of an Unusual Meaning

The relevant legislative history, which is set forth in the majority's opinion, majority op. pp. 350-351, and need not be repeated here, fails to support the majority's view that Congress intended the term "cancellation" to have any unusual meaning. Indeed, the best the majority can muster is the observation that no language in the legislative history explicitly contradicts its extraordinary view.[5] However, congressional silence on the point is insufficient to prove the majority's contention that Congress intended the term "canceled", in section 453B(f), to have some unusual meaning. Thus, there is literally no evidence that Congress intended that a contract carried out in accordance with its terms might be viewed as canceled.

---

[4] A nice analogy in aid of understanding can be found in Prosser & Keeton, Torts sec. 49, at 332 (5th ed. 1984): "There is a genuine distinction between a satisfaction and a release. A satisfaction is an acceptance of full compensation for the injury; a release is a surrender of the cause of action, which may be gratuitous or given for inadequate consideration."

[5] That is not surprising, insofar as Congress can hardly be expected to disavow all potential unusual meanings but must assume that, absent some clear signal to the contrary, this Court will give words their usual (though perhaps technical) meanings.

*No Policy Reason Supporting the Majority Holding*

While it is not the function of this Court to consider policy for the purpose of making policy choices, the majority's holding would gain support if the Code or legislative history suggested some policy concern, applicable to the present situation, that Congress wished to address through section 453B. However, there is nothing to suggest that Congress intended section 453B to apply to a contingent payment sale.[6] The abuse with which Congress was concerned was noncontingent payment sales, where the unadjusted basis of the purchaser would, from the beginning, include all future payments and would not be reduced even if, upon death of the obligee, part of purchaser's obligation were abrogated and certain payments (for which basis "credit" had been given) never were made. In such case, the purchaser would have a fair market value basis despite having paid some lesser amount for the property and might achieve an economic but nontaxable profit. However, that abuse does not occur where property is sold for a SCIN because the obligor's cost basis in the purchased property in such a situation is no greater than his out-of-pocket cost. See sec. 1012; *Denver & Rio Grande Western R. R. Co. v. United States,* 205 Ct. Cl. 597, 505 F.2d 1266, 1269-1271 (1974) (contingent obligation excluded from cost basis); *Graf v. Commissioner,* 80 T.C. 944, 947 (1983) ("It is well settled that a taxpayer cannot include a contingent liability in his cost basis".); *Redford v. Commissioner,* 28 T.C. 773, 777-778 (1957) (contingent portion of purchase price, not in fact paid, not added to cost basis). Regulations proposed by the Treasury specifically provide that the unadjusted basis of property is to be redetermined for cost recovery purposes on account of a contingent purchase price, with that basis being increased as the contingency occurs. Sec. 1.168-2(d)(3)(i) and (ii), *Example (2),* Proposed Income Tax Regs., 49 Fed. Reg. 5946 (Feb. 16, 1984). Thus, the unadjusted basis of property acquired for a SCIN will not at any time include payments still contingent and the free step-up-in-basis abuse that concerned Congress in the context of a noncontin-

---

[6]It may be worthwhile to reiterate that the majority's conclusion that the transactions in question were not contingent sales is insupportable: Sec. 15A.453-1(c)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981), deals with qualification for installment treatment, which, because respondent has conceded the point, is not here at issue.

gent payment sale will not here occur. Accordingly, I see no policy concern suggesting that Congress intended cancellation to have an unusual meaning or that otherwise indicates that section 453B(f) was intended to apply to the present situation.

### Inconsistency with Estate of Moss

Moreover, the majority's holding is inconsistent with *Estate of Moss v. Commissioner,* 74 T.C. 1239 (1980), where we previously recognized the contingent nature of the payments potentially due under a SCIN. See also *Cain v. Commissioner,* 37 T.C. 185 (1961). In *Estate of Moss,* we held that a "self-cancellation" clause that becomes operable at the death of the obligee does not cause the unpaid balance (as of the moment before the obligee's death) of a promissory note to be included in the obligee's gross estate. *Estate of Moss v. Commissioner, supra* at 1246-1248. We based that holding upon the determination that, at the time of decedent's death, decedent had no interest in the notes. *Id.* at 1247 ("Since there is not interest remaining in decedent at his death, we hold that the notes are not includable in his gross estate."). Our determination that, at death, decedent had no interest in the notes was based upon our determination that an interest in a SCIN is similar to a life estate, which is not canceled upon the death of the holder but simply ceases of its own accord. *Id.* Thus, in *Estate of Moss,* we recognized that decedent, at death, has no interest remaining and therefore no right to collect on a SCIN. *Id.* A fortiori, when decedent has no interest remaining and no right to collect, borrower has no obligation to pay. At decedent's death, borrower has no obligation capable of being canceled and decedent (or decedent's estate) has no rights upon which he (or his estate) can effect a cancellation. To suppose, as does the majority, that, at death, decedent canceled borrower's obligation to pay is to suppose—contrary to our express holding in *Estate of Moss*—that decedent had some interest he could relinquish and that borrower had some remaining obligation that could be canceled. The majority fails to explain whether or how its holding might be reconciled with *Estate of Moss* or with this Court's understanding of life estates in general.

## *Inconsistency with Treatment of Private Annuities*

The majority's position is also irreconcilable with the Code's treatment of private annuities.[7]  Under section 72, a taxpayer who does not recover his entire investment from an annuity contract is permitted a deduction to the extent of his unrecovered investment.  Sec. 72(b)(3).  Obviously, that deduction is based upon the determination that the holder of a life annuity does not take into gross income amounts that, due to his death, are never received:  for if such amounts were considered taken into gross income, no investment would be lost and no deduction would be appropriate.  Thus, the Code recognizes that where a taxpayer's right to private annuity payments is contingent upon his being alive on a particular date, and the taxpayer is not alive on that date, the taxpayer does not have income in the amount to which he otherwise would have been entitled.

The nature of obligor's potential obligation is the same for a SCIN as for a life annuity, insofar as such potential obligation only comes into existence if obligee is alive on the appropriate date.  At death, the estates of an annuitant under a life annuity and an obligee of a SCIN are in precisely the same position:  each has no right to additional payments because obligor's potential obligation to make additional payments never arose.  Yet the majority has elected to ignore the equivalence of those two transactions.  Without arguing, much less demonstrating, that the contingent nature of the potential payment obligation on a SCIN is any different from that in the private annuity context, the majority requires, for the SCIN alone, that the contingent, potential payment (that never occurs) must be taken into income.  The majority has failed to provide a logical argument for such inconsistent treatment.

## *The Slippery Slope*

Unfortunately, the majority's opinion may cause difficulties beyond those here apparent:  all contingent payment transactions between related persons, where the maximum sales price

---

[7]It is indisputable, I think, that sec. 453B(f) does not apply to private annuities.  See S. Rept. 96-1000 (1980), 1980-2 C.B. 500 n.12 ("Another technique used for intra-family transfers involves the so-called 'private annuity' arrangement.  The bill does not deal directly with this type of arrangement."); H. Rept. 96-1042, at 10 n.12 (1980) (incorporating the same language).

exceeds some lesser contingent price, would be within the scope of today's ruling. The majority, presumably, would hope to limit the effect of its opinion to those contingent payment sales that fail to "qualify" under section 15A.453-a(c)(1), Temporary Income Tax Regs., 46 Fed. Reg. 10711 (Feb. 4, 1981), but such limitation would rest on no firm principle. Under section 453B(f), if the obligor and the obligee are related persons within the meaning of section 453(f)(1), the fair market value of the obligation canceled is treated as not less than its face amount. Under the majority's rationale, an obligation that would have come into being, but for the occurrence of some contingency, is deemed canceled. There is no basis for supposing that the nature of the contingency leading to nonpayment is determinative of whether a cancellation has occurred. Thus, if the occurrence of a contingency unrelated to the value of the property sold constitutes a cancellation, the occurrence of a related contingency must do the same. Certainly, the majority has provided no principle for concluding otherwise. I am concerned that today's decision will cast doubt on the efficacy of the installment sale rules in all contingent payment sales between related persons.[8]

## Conclusion

For the reasons stated, I would hold that the notes here in question were not canceled nor did they otherwise become unenforceable within the meaning of section 453B(f). Thus, there was no disposition of the notes that would require any gain to be reported on decedent's final income tax return.

CHABOT, KÖRNER, WHALEN, and BEGHE, *JJ.*, agree with this dissent.

---

[8]Siblings are related persons within the meaning of sec. 453(f)(1). Thus, suppose that brother makes an installment sale of land to sister, sister to make four annual payments of $25x, except that sister need not make the final payment if, by its due date, certain zoning variances cannot be obtained. Putting aside the question of determining the face amount of the obligation if no further payments are due, would not the occurrence of the contingency there (failure to obtain the variance by the due date of the final payment) constitute a cancellation under the same logic that would say that a SCIN is canceled on the death of the obligor? If so, then has not doubt been cast on the efficacy of the installment sale rules in a class of transactions much larger than evidenced by Congress' concern with *Miller v. Usry,* 160 F. Supp. 368 (W.D. La. 1958), transactions?