EDWIN H. FRAZEE AND MABEL G. FRAZEE,
PETITIONERS *v.* COMMISSIONER
OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 27995-89, 27996-89.     Filed May 4, 1992.

*David R. Clark,* for petitioners.
*Thomas A. Dombrowski,* for respondent.

HAMBLEN, *Judge:* Respondent determined deficiencies in Edwin H. and Mabel G. Frazee's (petitioners) Federal gift tax and additions to tax for the taxable years as follows:

| Petitioner | Docket No. | Year | Deficiency | Addition to tax sec. 6660 |
|---|---|---|---|---|
| Edwin H. Frazee | 27995-89 | 1985 | $171,555 | $51,466.50 |
| | | 1986 | 59,472 | |
| Mabel G. Frazee | 27996-89 | 1985 | 171,555 | 51,466.50 |
| | | 1986 | 59,472 | |

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the taxable years at issue and Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions by respondent,[1] the issues remaining for decision are: (1) The fair market value of improved real

---

[1]Respondent conceded that the gross value of the property transferred by petitioners in 1985 to their children was $1,650,000 rather than $1,811,051 as determined in the statutory notice of deficiency. Respondent also conceded that petitioners were not liable for the addition to tax under sec. 6660.

property which petitioners transferred to their children for purposes of computing gift tax under section 2501; and (2) whether petitioners must use the interest rate provided in section 7872 to value the promissory note received in exchange for the transfer of improved real property to their children for gift tax purposes or whether they may instead rely on the interest rate provided in section 483(e).

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts, the supplemental stipulation of facts, the second supplemental stipulation of facts, and exhibits are incorporated herein by this reference.

Petitioners, husband and wife, resided in San Diego County, California, at the time they filed their petitions in these cases. Petitioners each timely filed Federal gift tax returns for the calendar years 1985 and 1986.

1. *Background*

For more than 50 years petitioners were growers and worldwide distributors of flower bulbs. As of 1984, petitioners wished to retire from the flower farming business. Petitioners consulted with their attorneys and accountants and decided upon an estate plan to transfer their business to their children. In 1985 petitioners disposed of a portion of their flower business, by transferring 12.2 acres of improved real property located in Carlsbad, California (Carlsbad property), to their four children, James D. Frazee, John C. Frazee, Dorislee Frazee, and Harley D. Frazee.

Petitioners transferred the Carlsbad property to their children receiving in exchange a promissory note in the principal sum of $380,000, bearing interest at 7 percent per annum, and secured by a first deed of trust on the Carlsbad property. The note, dated October 1, 1985, provides a 20-year graduated repayment schedule with quarterly payments. The final principal payment is due in October 2005. Petitioners did not receive a cash payment when they transferred the property to their children.

On October 7, 1985, petitioners executed two grant deeds relating to the Carlsbad property. One deed conveyed the

interest in the land and the other conveyed the interest in the improvements. Petitioners reported the transfer of the land portion as an installment sale on their 1985 income tax return. The deeds were held by petitioners' attorney, Charles Marvin, until November 21, 1985, when they were recorded. There were no negotiations between petitioners and their children as to the terms of the transfer of the Carlsbad property and no formal sales documents were prepared.

On September 19, 1986, petitioners each timely filed a gift tax return, reporting $605,000 in total gifts made during 1985. Petitioners reported that the value of the Carlsbad property was $985,000, $380,000 of which they assigned to the land and for which they received a 7-percent promissory note and $605,000 which was assigned to the improvements. Petitioners reported the transfer of the improvements to their children as a gift. The reported value of $985,000 was based on a report prepared for petitioners by William C. Markley, Jr., dated May 23, 1985. On their 1985 gift tax returns, petitioners consented to have gifts made by either of them considered as made one-half by each spouse and reported no tax due after application of the unified credit.

## 2. *The Carlsbad Property*

### A. *Background*

In 1968 petitioners purchased the Carlsbad property, a 10-acre parcel located at 6145 Laurel Tree Road in Carlsbad, California, for use as a flower distribution center. The purchase price was $50,000. Petitioners shortly thereafter acquired approximately 2 adjoining acres. As of 1985, petitioners claimed an $81,770 basis in the land. Subsequently, petitioners constructed a warehouse building (warehouse) on the property at a cost of approximately $180,000. The warehouse contains office space, loading docks, and five large special-purpose coolers. The building is used to process and store flowers and flower bulbs. On October 7, 1985, the Carlsbad property consisted of a 12.2-acre tract of real property, a warehouse, and approximately 50,000 square feet of partially paved roads and parking areas. Petitioners made approximately $73,000 in additional improvements to the property prior to transferring it to their children. Petitioners'

total investment in the Carlsbad property as of the date of transfer was approximately $335,000 ($81,770 plus $180,000 plus $73,000).

The property, which has an irregular shape, is located approximately 1 mile east from the Palomar Airport. It has frontage on Laurel Tree Road and extends to the west approximately 1,165 feet. An asphalt road provides access from the property to Laurel Tree Road which provides direct access to the four-lane Palomar Airport Road. The western two-thirds has a depth of 484.7 feet. The property is almost level near grade; however, the western rear perimeter of the site has a steep upward slope. Utilities, including public water, sewer, gas, and electric, are easily accessible to the property and drainage is adequate. A small stream or drainage area runs along the northerly border of the property.

The warehouse, a 17-year-old, 38,400-square-foot metal Butler building, was in average condition at the date of gift. However, the warehouse was below industrial standards. The interior has a special-purpose design for the storage and packaging of flowers. Approximately 50 percent of the interior consists of large coolers and heating rooms.

The properties immediately surrounding the Carlsbad property were vacant in 1985. However, to the south, the Carlsbad property was surrounded by a group of retirement homes for the Sudean Mission.

During 1985 the area surrounding the Palomar Airport was one of the fastest developing areas in north San Diego County. The Carlsbad property is located on the south side of Palomar Airport Road. There was an extensive increase in the development of both industrial and commercial properties, and land values were on an upward trend at this time. One mile east of the subject site, the Palomar Airport area was emerging as a major office and development center. Additionally, there were a number of planned industrial projects located in the vicinity of Palomar Airport Road.

Compared to commercial and industrial activity in the Carlsbad area, residential land values were level or in decline during the relevant period. There were no sales of agricultural land in Carlsbad, nor were there any rezonings of agricultural land in Carlsbad in the years immediately before and after the gift in these cases.

## B. *Zoning*

In October 1985, the Carlsbad property was zoned as limited control (L-C) and exclusive agriculture (E-A). Under the city of Carlsbad zoning ordinance, the purpose of the L-C zone is to provide an interim zone for areas where planning for future uses have not been completed or plans of future development have not been formalized. After proper planning or plan approval, property zoned L-C may be rezoned.

The E-A zone provides for agricultural uses in areas not suited for urban development. The E-A zoning permits crop production, floriculture, greenhouses less than 2,000 square feet, sheep and cattle production (maximum 1 per half acre), poultry, rabbits and chinchillas (maximum 25), roadside stands, and tree farms. Petitioners and their children never attempted to, nor did they want to, rezone their property. The Carlsbad property, therefore, retained this E-A zoning classification as of the date of trial.

During 1985 the general plan designation of the Carlsbad property was nonresidential reserve (NRR). The general plan designation of the area surrounding the Carlsbad property was changed from NRR to planned industrial (PI) in December 1982. The city of Carlsbad also changed the future land-use plan along Palomar Airport Road to PI. In 1983 the area adjoining the Carlsbad property in all four directions was rezoned from E-A to PI, qualified overlay zone. This zoning allows businesses and light industries engaged in research and light manufacturing, business and professional offices, and related commercial uses. At the time petitioners transferred the Carlsbad property to their children, these properties were vacant and none of the property owners had submitted a site plan to begin industrial development. By 1985 the Carlsbad property was the only property zoned E-A in the immediate area.

Under the city of Carlsbad's general land-use plan and zoning ordinance, an E-A zoning designation is not considered a permanent designation unless the property is part of the agricultural preserve under the Williamson Act of the State of California (Williamson Act).[2] The Carlsbad property was not

---

[2] California Land Conservation Act of 1965 (Williamson Act), Cal. Govt. Code sec. 51200-51295

within the agricultural preserve under the Williamson Act. Moreover, the city does encourage agricultural use as long as it is economically feasible, but it is not considered a permanent zoning.

Under Carlsbad and California planning laws, if a party applies to the city planner for a rezoning which is consistent with the city's general plan, the city planners must recommend that the change be approved or the city's general plan must be changed. In addition, according to the city planning director, city planning departments must act on a rezoning application within 6 to 12 months after it is filed. Subsequent to receiving approval from the Carlsbad planning department, the rezoning application must also be approved by the Carlsbad planning commission and the Carlsbad city council. In 1982 the application fees for properties surrounding the Carlsbad property were approximately $400 to $500. Such fees had not been modified by 1985.

After a property is rezoned PI, in order to develop the property, the owner must acquire a planned industrial permit. This permit is a site plan for how the property will be developed. However, a site plan is not required to merely rezone property. It is only required when the property owner is ready to actually develop the property. The city must take action on this application to develop within 6 to 12 months.

In addition to being subject to city of Carlsbad zoning ordinances, properties located in the coastal zone are also subject to the jurisdiction of the California Coastal Commission (coastal commission). According to the Carlsbad assistant planning director, this entails a separate review process to rezone or further develop affected properties. The Carlsbad property lies within the coastal zone and is subject to the jurisdiction of the coastal commission.

For a number of years there was no agreement, cooperation, or coordination between the coastal commission and the city of Carlsbad. During 1985 the city of Carlsbad and the coastal commission entered into a process to develop communication and coordination between them. One of the outstanding issues

---

(West 1983). The Williamson Act provides that property will be taxed at a lower value if the owner contracts with the city and California to keep the property in agricultural use. Properties participating in the program are under a contract to remain in agricultural use. See *id.* sec. 51205.

was permanent agricultural use. The city of Carlsbad's local coastal program (LCP) consists of three land segments. Due primarily to a disagreement over the need to preserve agricultural land, the city had not implemented two segments, Mello I and Mello II, by October 1985. As a result, properties in these segments were required to follow a dual permit process prior to development and were subject to agriculture restrictions.

The Mello II segment land-use plan designated approximately 871 acres of coastal land as planned agricultural (P-A). This zoning permitted only agricultural uses. The Carlsbad property was not part of the Mello II land and, therefore, was not subject to the agricultural use restrictions imposed by the coastal commission. However, some of the properties surrounding the Carlsbad property were part of Mello II.

The city of Carlsbad recommended an amendment to the Mello II segment in August of 1985. The amendment to the Mello II segment of the city of Carlsbad's LCP was certified by the coastal commission on October 24, 1985. The amendment removed the restrictions to conversion of agricultural land in the Mello II segment. The amendment provided for conversion of agricultural land through any of three options. The certification of these amendments resulted in identical standards for conversion of agricultural land being applied by the coastal commission and the city of Carlsbad.

## ULTIMATE FINDING OF FACT

On October 7, 1985, the fair market value of the Carlsbad property was $1 million allocating $950,000 to the land portion and $50,000 to the improvements.

## OPINION

Section 2501 imposes a tax on property transferred by gift. Sec. 2501(a); see also sec. 2511(a). Section 2512(b) provides that "Where the property is transferred for less than an adequate and full consideration in money or money's worth, then the amount by which the value of the property exceeded the value of the consideration shall be deemed a gift". The Federal gift tax provisions reach further than the common law concept of gifts and embrace sales and other exchanges of

property when the value of the property transferred exceeds the value of the consideration received. Sec. 25.2512-8, Gift Tax Regs. The Supreme Court interpreted section 2512 as dispensing with the test of "donative intent" in favor of a "much more workable external test" that "where 'property is transferred for less than an adequate and full consideration'", then the excess "'shall, for * * * [the purposes of gift tax] be deemed a gift'". *Commissioner v. Wemyss,* 324 U.S. 303, 306-307 (1945). Therefore, we must determine the value of the Carlsbad property and the value of the consideration received, the promissory note, to determine the amount of gift subject to tax under section 2501.

Transfers of property in the ordinary course of business are not subject to gift tax. Sec. 25.2512-8, Gift Tax Regs. To qualify, the transaction must be bona fide, at arm's length, and free from any donative intent. *Id.* As we noted in *Harwood v. Commissioner,* 82 T.C. 239, 258 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986) (citing *Estate of Reynolds v. Commissioner,* 55 T.C. 172, 201 (1970)), "Transactions within a family group are subject to special scrutiny, and the presumption is that a transfer between family members is a gift." There is nothing in the record to indicate that the transfer in issue qualifies as a transaction in the ordinary course of business. Petitioners have failed to meet their burden of proof that the transaction constituted a transfer in the ordinary course of business. The fact that petitioners filed a gift tax return for the transaction corroborates the conclusion we reach here. We conclude that petitioners made a gift to their children in the amount that the value of the Carlsbad property exceeded the value of the promissory note received.

## Issue I: *The Carlsbad Property*

### A. *Background*

The first issue for decision is the fair market value of the Carlsbad property. On their 1985 gift tax returns petitioners reported that the fair market value of the Carlsbad property was $985,000, allocating $380,000 to the land portion and $605,000 to the improvements. Respondent determined, after concessions, that the fair market value of the Carlsbad property was $1,650,000. At trial the parties presented expert

witnesses who testified to values ranging from $470,000 to $1,650,000. Respondent's determination in the notices of deficiency as to the fair market value of the Carlsbad property is presumptively correct, and the burden of proving a lower value rests on petitioners. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933).

Section 2512(a) provides that, for gift tax purposes, the value of the property transferred shall be determined as of the date of gift. The property is valued as of the date when the donor releases dominion and control over the property. Sec. 25.2511-2(b), Gift Tax Regs. The valuation date in these cases was October 7, 1985, the date on which the deeds were signed and petitioners transferred dominion and control over the Carlsbad property to their children.

Value, for purposes of gift tax, means fair market value. See sec. 2512 and regulations promulgated thereunder. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell, and both having reasonable knowledge of the relevant facts. Sec. 25.2512-3(a), Gift Tax Regs.; *United States v. Simmons,* 346 F.2d 213, 217 (5th Cir. 1965); see *Estate of Bright v. United States,* 658 F.2d 999, 1005-1006 (5th Cir. 1981).

As we noted in *Estate of Spruill v. Commissioner,* 88 T.C. 1197, 1228 (1987), "Valuation is not an exact science and each case necessarily turns on its own particular facts." Consequently, the valuation of an interest in real property for gift tax purposes is a question of fact. *Estate of Watts v. Commissioner,* 823 F.2d 483, 485 (11th Cir. 1987), affg. a Tax Court order in docket No. 27005-82; sec. 25.2512-3(a), Gift Tax Regs.; see *Estate of Spruill v. Commissioner, supra* at 1228; *Skripak v. Commissioner,* 84 T.C. 285, 320 (1985). All relevant facts and elements of value as of the time of gift are considered by this Court in valuing property. See sec. 25.2512-1, Gift Tax Regs. Moreover, we value property without regard to hindsight, focusing only on the market conditions and facts available on the date of the gift. *Estate of Gilford v. Commissioner,* 88 T.C. 38, 52 (1987).

In addition to expert reports, petitioners introduced 1985 and 1986 San Diego County property tax bills relating to the Carlsbad property as evidence of the fair market value of the

property. For purposes of local property taxes, the property was valued at approximately $375,000 for 1985 and $975,000 for 1986, which was after the date of transfer. However, "We do not consider that the amount for which the property was assessed for purposes of local taxation is necessarily a reliable criterion to be used in estimating its fair market value." *Estate of Lippincott v. Commissioner*, 27 B.T.A. 735, 740 (1933). As nothing in the record demonstrates that the assessed value was intended to represent the fair market value of the property, we will not rely on this evidence in reaching our determination of the value of the Carlsbad property. Sec. 25.2512-1, Gift Tax Regs.

### 1. *Highest and Best Use*

The principal reason for the different values assigned to the Carlsbad property by the parties is their disagreement as to the highest and best use of the property in 1985. Respondent claims the highest and best use is as industrial or commercial property. Petitioners contend the highest and best use is as agricultural property, its existing use.

Property should be valued to reflect the highest and best use of the property on the date of the valuation. *Symington v. Commissioner*, 87 T.C. 892, 896 (1986); *Stanley Works v. Commissioner*, 87 T.C. 389, 400 (1986). In determining the highest and best use, and in turn the fair market value of property, "the realistic, objective potential uses" of the property control. *Stanley Works v. Commissioner, supra* at 400. The highest and best use of property is the "reasonable and probable use that supports the highest present value". *Symington v. Commissioner, supra* at 897. To determine what uses are reasonable and probable, we focus on "The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future". *Olson v. United States*, 292 U.S. 246, 255 (1934). The fair market value of property is not affected by whether the owner has actually put the property to its highest and best use, nor whether he ever intends to do so. *Stanley Works v. Commissioner, supra* at 400. Therefore, it is irrelevant that petitioners never intended to develop the property into an industrial use. If it is reasonable and probable that the Carlsbad property could be rezoned to an industrial use and

that there was a demand for industrial property within a reasonable proximity to the gift, this must be factored into the valuation.

Petitioners rely on *United States v. Meadow Brook Club,* 259 F.2d 41 (2d Cir. 1958), for the proposition that only a use which is permitted under current zoning restrictions may be considered as the highest and best use of the property. However, in *Meadow Brook Club,* the court stated that, "if existing zoning restrictions preclude a more profitable use, *ordinarily* such use should not be considered in the evaluation." *Id.* at 45 (emphasis added). We do not read this as an unconditional, definitive, or fixed rule, but rather as a pragmatic guide to consider varyingly under the circumstances before us. For example, in *Estate of Wolfe v. Commissioner,* a Memorandum Opinion of this Court dated Jan. 15, 1954, the status of a rezoning was on appeal on the date of valuation. We noted that the property could not be valued as though the rezoning was already "a fait accompli", but "the fact that a change in zoning was in prospect is an element that *certainly* can be taken into account in determining value". *Id.* (emphasis added). Moreover, other courts have held that when there is a reasonable *probability* that zoning regulations will change within the near future, a court may factor in the change. *Investors Funding Corp. of New York v. Bloor,* 592 F.2d 134, 136 (2d Cir. 1979); *Estate of Pattison v. Commissioner,* T.C. Memo. 1990-428. Applying the above standard of highest and best use, we focus on whether it is reasonable to conclude that a willing buyer in 1985 would have considered the Carlsbad property as a site for industrial development. See *Stanley Works v. Commissioner, supra* at 401.

In these cases, the evidence as to the probability of rezoning is contradictory at best. Mr. Frazee contends that "people around [him] that were trying to get it zoned, it was almost impossible * * * they * * * still haven't got it rezoned." In fact the property surrounding the Carlsbad property had already been rezoned to industrial by 1983. The possibility of rezoning has never been tested because neither petitioners, nor their children, have tried to have the property rezoned.

Michael J. Holzmiller (Mr. Holzmiller), the planning director of the city of Carlsbad, indicated that it was possible, although not absolutely certain, that the Carlsbad property could have

been rezoned in 1985. Mr. Holzmiller was subpoenaed to testify in these cases. Mr. Holzmiller became the planning director in approximately 1984. As planning director, he is responsible for insuring that all properties in the city of Carlsbad conform with the Carlsbad zoning regulations. Mr. Holzmiller assists in formulating zoning regulations and reviews applications for changes to the regulations.

Overall, the testimony elicited by petitioners at trial does not support their contention that rezoning the Carlsbad property in 1985 was impossible. Mr. Holzmiller's testimony establishes that in October 1985 there was a realistic, feasible possibility that a change in zoning to industrial could have been attained. Rezoning the Carlsbad property to industrial was reasonable and probable based on the following factors: (1) The city of Carlsbad did not consider agricultural use to be a permanent land use unless the property was part of the agricultural preserve; (2) all of the properties surrounding the Carlsbad property were rezoned industrial; (3) there was significant industrial growth during this period; and (4) no site or development plans are required when a rezoning is sought. All of the above supports the conclusion the highest and best use of the Carlsbad property as of October 7, 1985, was as industrial.

We have addressed the possibility of rezoning in the highest and best use analysis before. *Ebben v. Commissioner,* 783 F.2d 906 (9th Cir. 1986), affg. on this issue T.C. Memo. 1983-200. In *Ebben* we found that a change of zoning was not probable for purposes of valuation. The taxpayer's appraiser valued the property as though it was rezoned from agricultural to industrial. We held that the highest and best use of the property was agricultural based on a lack of industrial potential in the foreseeable future and lack of evidence regarding zoning.

The cases before us are distinguishable. First, in *Ebben,* only 10 percent of the industrial district had been developed. Therefore, there was no need to rezone any more land for industrial development since there was an ample supply for industrial development. In these cases, the Palomar Airport area was experiencing great growth and development throughout 1985. Although there were a number of vacant industrially zoned properties, significantly more than 10 percent of the industrial area was under development. Second, in *Ebben,* the director of industrial development testified that he would have

supported a rezoning 4 years after the date of valuation. He did not indicate whether there would have been support for a rezoning on the date of valuation. To the contrary, in these cases the city planning director at the date of valuation confirmed that the Carlsbad property could have been rezoned to industrial in 1985. In sum, there is substantially more evidence demonstrating that the highest and best use of the Carlsbad property was industrial than the evidence elicited in *Ebben.*

## 2. *California Coastal Commission Influence*

A further complicating factor in determining the value of the Carlsbad property is the authority of the California Coastal Commission over the property. Property in Carlsbad's coastal zone is within the jurisdiction of the coastal commission in addition to being subject to local Carlsbad zoning ordinances. As previously noted, petitioners bear the burden of proving that respondent's valuation is incorrect. Rule 142(a); *Welch v. Helvering,* 290 U.S. 111 (1933). As part of their burden, they must demonstrate the significance of the coastal commission's influence on the value of the Carlsbad property if they hope to reduce the value which respondent determined. In any event, the coastal commission's influence only affects these cases to the extent that it affected the fair market value of the subject property on the date of gift. Petitioners conceded that "although it is true that the Carlsbad property was not in the agricultural preserve so as to have required a perpetual agricultural use, it was nevertheless agriculturally zoned and also subject to the same *restrictive influences* imposed by the California Coastal Commission." (Emphasis added.)

Petitioners presented no evidence elaborating on this alleged restrictive influence. The evidence is incomplete as to the coastal commission's influence on the subject property. The testimony of the assistant planning director for the city of Carlsbad, Mr. Gary Wayne, clearly establishes that the Carlsbad property was not part of the Mello II segment and was, therefore, not directly affected by the amendments adopted in 1985. However, Mr. Holzmiller's testimony demonstrated a certain amount of confusion surrounding the influence. In our opinion, it also demonstrated that buyers in 1985 might have been concerned about the coastal commission's influence and

thereby reduce the amount they were willing to pay for the Carlsbad property. However, as petitioners bear the burden of proving respondent's determination incorrect, and the record is devoid of any conclusive evidence relating to the coastal commission's influence, we can only give limited weight to this factor in reaching a value for the property.

### B. *Valuation of the Carlsbad Property*

Four experts testified and five valuation reports were admitted into evidence relating to the value of the Carlsbad property. With the exception of William C. Markley, Jr., each report was prepared 3 to 5 years after the gift and attempted to establish a retrospective value for the Carlsbad property. The appraisers submitted the following values:

| | |
|---|---|
| William C. Markley, Jr. (for petitioners) | $985,000 |
| Don W. Blackstone (for petitioners) | 470,000 |
| Sandra T. Orozco (for respondent) | 1,500,000 |
| James W. Waldorf (for respondent) | 1,325,000 |
| Larry E. Mack (for respondent) | 1,850,000 |

Expert opinion is admissible if it will assist the trier of fact to understand evidence that will determine the fact in issue. See Fed. R. Evid. 702. We are not bound by the opinion of an expert witness when the opinion is contrary to our judgment. *Estate of Newhouse v. Commissioner,* 94 T.C. 193, 217 (1990); *Parker v. Commissioner,* 86 T.C. 547, 561 (1986). We look to the expert's qualifications and all other credible evidence in reaching our determinations. *Johnson v. Commissioner,* 85 T.C. 469, 477 (1985). Moreover, we may either accept the opinion of the expert in its entirety, *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. 441, 452 (1980), or we may rely on any portion of an opinion as we may find it insightful and reliable. *Parker v. Commissioner, supra* at 562. Finally, as we noted in *Estate of Halas v. Commissioner,* 94 T.C. 570, 577 (1990), "experts may lose their usefulness and credibility when they merely become advocates for one side."

### 1. *Petitioners' Valuation Reports*

### a. *William C. Markley, Jr.*

Petitioners employed William C. Markley, Jr. (Mr. Markley), an appraiser, to value the Carlsbad property prior to transfer-

ring the property to their children. Mr. Markley specialized in appraising properties in the Carlsbad area and was a resident of Carlsbad for 16 years. He holds the designation of senior residential appraiser for the Society of Real Estate Appraisers, class IV.

Mr. Markley prepared his report to be used for estate purposes and refinancing. Mr. Markley appraised the property as of May 23, 1985, 6 months prior to the gift. Based primarily on the cost and income approaches to valuation, Mr. Markley concluded that the value of the Carlsbad property was $985,000, allocating $380,000 to the land and $605,000 to the improvements. Mr. Markley, noting that future industrial development of the property could require several years of negotiations with the coastal commission, determined that the highest and best use of the Carlsbad property for purposes of his report was agricultural. Mr. Markley prepared the report with the understanding that the highest and best use must be a legal use, the current legal zoning.

In his report, Mr. Markley utilized the cost approach to valuation. The cost approach estimates value by determining the replacement cost of the improvements (warehouse) reduced for depreciation, and then adds the estimated fair market value of the land to reach a final value. Mr. Markley valued the land portion of the Carlsbad property at $378,000 ($31,000 per acre). The five comparable sales that he used ranged in price from $21,318 to $31,250 per acre. All of the comparable sales were zoned residential with a general plan designation of residential. Four of the parcels were in agricultural use and all the parcels were within the jurisdiction of the coastal commission. Four of the sales occurred prior to July 1983 and the sale closest to the gift date was January 1985. After adjustments, and placing less emphasis on the 1985 sale, Mr. Markley valued the Carlsbad land rounded at $378,000 ($31,000 an acre).

Mr. Markley determined that the replacement cost of the improvements new was $1,531,611. After adjustments for physical and functional depreciation and applying a 10-percent salvage value to the heating rooms and coolers, the improvements were valued at $615,676. This, added to the value of the land, $378,000, resulted in a rounded value of $994,000.

The second approach which Mr. Markley utilized was the income approach. The income method determines fair market value by considering the value of the stream of future income (rent) to be produced by the property. This methodology is generally utilized for income-producing property. The estimated rental income is capitalized by using a rate taken from the current market. Because Mr. Markley concluded that a warehouse lessee would generally have no need for the special-purpose facilities (coolers and heating rooms), he considered the building as a steel warehouse/distribution building with dock-high loading facilities.

The six comparable rental properties ranged from a 102,000-square-foot building with 22 rental units, to industrial buildings, some with air conditioning and office space, to an 18,000-square-foot steel warehouse building. The rate per square foot varied from $0.22 to $0.49. Adjustments were made for quality, condition, location, and parking areas.

Mr. Markley utilized a 10-percent capitalization rate. Applying the above data and assuming a normal land-to-building ratio, he arrived at an effective gross income of $78,550. Mr. Markley capitalized this figure at a rate of 10 percent. This indicated a value of $785,000. The final estimate, including $186,000 for the excess land value, was $971,500.

Mr. Markley relied least heavily on the market data approach, which is based on an analysis of the sales of similar warehouse facilities. Mr. Markley determined that the majority of sales of buildings in the Carlsbad area consisted of new industrial buildings in the Palomar Airport Park and the Carlsbad Research Center which were superior in quality to the Carlsbad warehouse. Utilizing three comparable sales and making adjustments for excess land, Mr. Markley determined that the value of the Carlsbad property utilizing the market data approach was $1,014,000.

We find Mr. Markley's report insightful and beneficial. Mr. Markley was the only expert to appraise the property during 1985. His impressions of the general market conditions are therefore important in determining the prospective purchaser's frame of mind in 1985. Moreover, he was the only appraiser to inspect the improvements.

However, we find a number of deficiencies in his approach. Most importantly, Mr. Markley did not factor in the possibility of a rezoning to industrial which necessarily would have increased the market value of the property. Mr. Markley's appraisal was based on exclusive agricultural use because of what Mr. Markley perceived as risks of rezoning, coastal commission influence, and the depressed market. Mr. Markley estimated that coastal commission approval would take anywhere from 5 to 10 years to acquire. However, at trial, Mr. Markley testified that he did not contact the coastal commission as part of preparing his report. Moreover, no other evidence was submitted sufficiently demonstrating the difficulty and time necessary for gaining coastal commission approval.

Additionally, we find a number of flaws in the cost approach employed by Mr. Markley. Four of the comparables, which Mr. Markley relied on most heavily, were sales 2 to 4 years prior to the valuation date. The properties were all residentially zoned and lacked improved road access. Moreover, there were significant differences in topography (rolling hills). At trial, Mr. Markley did not adequately explain how his adjustments to the comparables were made to compensate for these differences. We find that the comparable sales used resulted in a lower value of the land portion of the property than the fair market value in 1985. Finally, as the majority of appraisers determined, the warehouse would have only an interim value to the property at its highest and best use. Mr. Markley attributed $605,000 to the warehouse. Although the warehouse, paved driveways, and roads add value to the property, we find this to be a gross overstatement of their value.

### b. *Don W. Blackstone*

Don W. Blackstone (Mr. Blackstone) was petitioners' expert witness and his valuation report was admitted into evidence. He achieved the MAI designation of the American Institute of Real Estate Appraisers and the SRPA designation of the Society of Real Estate Appraisers. The MAI designation is the most highly recognized appraisal designation within the appraisal community. Mr. Blackstone has been an independent appraiser in San Diego for 20 years. During this time, he appraised

an industrial park and a planned residential development in the vicinity of the Carlsbad property.

Mr. Blackstone determined that the highest and best use for the Carlsbad property was its existing agricultural use. Mr. Blackstone operated under the definition that highest and best use is the use most likely to produce the greatest return over time, but it only includes those uses which are natural, probable, and legally permissible. He valued the property as agricultural.

In preparing his report, Mr. Blackstone utilized the market data approach to valuation. In Mr. Blackstone's opinion, the income approach was not applicable because the Carlsbad property was not the type normally considered income-producing property which made it difficult to find sufficient data to develop comparables. Mr. Blackstone found the cost approach inapplicable because the improvements covered only a small portion of the property and because they only added an interim value to the land. In his opinion, to utilize the property at its highest and best use, the improvements would be demolished or moved. We agree.

Mr. Blackstone's report was premised on an absolute prohibition against any use besides agricultural. Mr. Blackstone was working under the assumption that on the date of valuation all property zoned E-A would have been required to be maintained for agricultural use in perpetuity. He testified that if the property was not subject to prohibition it would have been valued higher. Because there were no recent agricultural sales, Mr. Blackstone did not consider any comparable sales with the exclusive agricultural zoning. The comparable parcels were zoned industrial and residential with a current agricultural use. None of the comparables had been put to an industrial use.

Mr. Blackstone compared three parcels of land in his report. The properties were all vacant parcels ranging in size from approximately 65 acres to 333 acres, in price from $27,119 to $125,919 per acre, and in date from May 15, 1985, to October 11, 1985. Adjustments were made for location, topography, date of sale, and size. Mr. Blackstone made downward adjustments to two sales, which had obtained industrial zoning, for the costs of securing a rezoning and a general plan amendment. An additional adjustment was made for the

difficulty and risk of rezoning the Carlsbad property to industrial because of a perceived coastal commission policy regarding rezoning. After adjustments, comparable sales ranged from $29,500 to $56,000 per acre. Mr. Blackstone concluded that the Carlsbad property had a value of $40,000 per acre.

Mr. Blackstone assigned no value to the improvements, nor did he assign an interim value to the improvements. Instead, Mr. Blackstone reduced his appraisal by $20,000 to reflect the cost of demolishing the improvements. Based on this, he concluded that the market value of the Carlsbad property on October 7, 1985, was $470,000 (approximately $40,000 per acre less $20,000). The major weakness in Mr. Blackstone's report is that the property was valued as though it was located within the agricultural preserve. However, the record establishes that the Carlsbad property was not within the agricultural preserve. Therefore, a fundamental premise underlying his appraisal was incorrect. As the record demonstrates, commercial and industrial properties were selling at a much higher price than residential properties and properties within the agricultural preserve. Therefore, Mr. Blackstone's incorrect presumption leads to a much lower value.

Additionally, we find it problematic that Mr. Blackstone placed less emphasis on the two sales of industrially zoned property. More weight should have been placed on these sales since it was possible that a rezoning could be attained. These properties sold for between approximately $55,000 and $126,000 per acre. Based primarily on the fact that Mr. Blackstone erroneously assumed that the property was subject to the agricultural preserve, we find his valuation is lower than the actual fair market value as of October 1985.

## 2. *Respondent's Valuation Reports*

### a. *Sandra T. Orozco*

The valuation report of Sandra T. Orozco (Ms. Orozco), a real estate appraiser for respondent, was admitted into evidence. The report was dated November 28, 1988. Ms. Orozco, who assessed the Carlsbad property as 11.75 acres rather than 12.2, valued the Carlsbad property as of October 1985 as $1,500,000 ($128,000 per acre).

Based on the American Institute of Real Estate Appraisers, Appraisal Terminology and Handbook (5th ed. 1967), definition of highest and best use,[3] and a conversation with a Carlsbad city planner who indicated that the property could be developed into industrial use, Ms. Orozco concluded that the highest and best use of the Carlsbad property was as industrial property. Ms. Orozco considered the warehouse to be an interim use and, therefore, valued the Carlsbad property as a vacant parcel.

Ms. Orozco's report was based entirely on the market data approach to valuation. Ms. Orozco's comparable sales consisted of 5 tracts of land varying in size from approximately 2.24 acres to 13.5 acres, in price from $132,074 to $380,535 per acre, and in date of sale from February 1983 to September 1984. The parcels were all zoned industrial.

Adjustments were made to the sales based on the differences in lot size, location, and date of sale. The report provided no explanation as to how the adjustments were determined. An adjustment of $87,120 per acre was derived from the market where the comparable had offsite improvements. There was no adjustment for the risk of rezoning or the time and expense of applying for rezoning. After adjustments, the price of the sales ranged from $128,497 to $217,308. Ms. Orozco determined that the lower end of value was the best indicator of value since plans to develop the Carlsbad property required approval by the coastal commission.

We find a number of weaknesses in Ms. Orozco's report. The sales used in the report were all approved for industrial development. They were located in established industrial parks. Several had been improved with buildings or offsites. In 1985 the Carlsbad property was an agricultural site with a

---

[3]The American Institute of Real Estate Appraisers, Appraisal Terminology and Handbook (5th ed. 1967), defines the highest and best use as:

The most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable continuous use to which the property is adapted and needed, or likely to be in demand in the reasonable near future. However, elements affecting value which depend upon events or a combination of occurrences which, while within the realm of possibility, are not fairly shown to be reasonably probable, would be excluded from consideration. Also, if the intended use is dependent on an uncertain act of another person, the intention cannot be considered. That use of land which may reasonably be expected to produce the greatest net return to land over a given period of time. That legal use which will yield to land of highest present value, sometimes called optimum use.

future land-use plan of industrial use. Because Ms. Orozco used fully approved industrial sites as comparables, the final value estimate should have been discounted to a present value which would reflect the risks and time necessary for a rezoning. Because Ms. Orozco's report did not discount the values of significantly superior properties, we find that her report overstates the value of the Carlsbad property.

b. *James W. Waldorf*

Respondent used two expert witnesses in presenting her valuation evidence. James W. Waldorf (Mr. Waldorf) has been an appraiser for approximately 20 years and has appraised property in the San Diego, California, area since 1972. He achieved the MAI designation of the American Institute of Real Estate Appraisers. As earlier noted, the MAI designation is the most highly recognized appraisal designation within the appraisal community. Since 1981, his business has been located in Carlsbad. Mr. Waldorf determined that the highest and best use of the Carlsbad property was industrial and valued the property at $1,325,000 as of October 1985.

In his report, Mr. Waldorf valued the property using only the market data approach. The properties Mr. Waldorf used as his comparable sales were vacant land parcels located within three-fourths of a mile from the Carlsbad property. Mr. Waldorf's comparable sales consisted of three industrial or office sites varying in usable acreage from 9.33 to 10.9 acres, in price from $3.61 to $4.73 per square foot, and in date of sale from November 1986 to October 1987. Mr. Waldorf's appraisal attributed only an interim use value to the existing improvements because he felt the existing warehouse building did not contribute much value to the property. He allocated approximately $10,000 for the cost of demolishing the warehouse. The valuation was based on an estimated value of $2.50 per square foot.

We find a number of flaws in Mr. Waldorf's report, all of which resulted in an inflated valuation. One of the comparables was in escrow in June of 1985. Since this sale was not closed, it cannot be used as an accurate reflection of market value. Additionally, Mr. Waldorf incorrectly noted in his report that the Carlsbad property was located east of the El Camino Real. In actuality, the property is located to the west.

Mr. Waldorf's report opined that properties to the west of El Camino Real "have been stymied from new development". At trial, in response to whether the Carlsbad property was subject to this condition, Mr. Waldorf conceded it was, but "not necessarily to the same extent as the other properties." It appears that this condition was not adequately factored into the valuation report.

More significantly, Mr. Waldorf did not factor in the risk that a rezoning would be disapproved by the city of Carlsbad or by the coastal commission in arriving at his valuation. At most, he considered the time period it would take to achieve a rezoning. The specific adjustment was not explained in the report. Rather, Mr. Waldorf claimed that the factor was utilized in his work notes. The comparable sales prices ranged from approximately $158,000 to $206,000 per acre. Mr. Waldorf estimated the market value of the Carlsbad property at $108,900 per acre. This difference may have been an adequate adjustment for the risks of rezoning. However, Mr. Waldorf did not explain his calculations and, therefore, we have no trail to follow. We find that Mr. Waldorf's report overvalued the Carlsbad property.

c. *Larry E. Mack*

Larry E. Mack (Mr. Mack), a real estate appraiser, was the final expert witness for respondent. Mr. Mack has been a real estate appraiser for approximately 13 years, but was an independent real estate appraiser for only 2 years. He was neither an MAI nor an SRPA appraiser. Moreover, he had never resided in San Diego County. Mr. Mack had limited experience in appraising properties in the San Diego area. Mr. Mack is a senior member of the National Association of Review Appraisers as well as a member of the International Right-of-Way Association.

Prior to preparing his report, Mr. Mack reviewed Mr. Markley's report. In his original report (original), Mr. Mack determined that the highest and best use of the Carlsbad property was industrial and valued the property as of October 1, 1985, as $1,850,000. In an addendum to the original report (supplemental), the value was revised to $1,650,000.

Mr. Mack placed most emphasis on the income approach because of what he considered a lack of directly comparable

data. Mr. Mack's original estimate applying the income approach was $2,100,000. This value was adjusted to reflect the fact that the current zoning of the property was not industrial. To compute the reduction, an 18-month discount factor was applied to account for the time necessary to obtain a zoning change. A 12-percent discount rate was considered to cover the risk of obtaining a rezoning. After modifying his valuation to place less emphasis on the existing improvement to the Carlsbad property, Mr. Mack valued the property at $1,850,000.

In Mr. Mack's supplemental report, he reanalyzed the property's income-producing capabilities and determined that his original report overstated the value. Mr. Mack determined that the warehouse did not represent the highest and best use of the property and that the improvement value was best expressed by its interim use over approximately 18 months required to obtain industrial zoning approval. Therefore, Mr. Mack valued the property at $35 per square foot discounted for the 18-month approval period plus the interim value of the improvements discounted at 12 percent. This resulted in a value of $1,650,000.

Mr. Mack makes what we consider an appropriate estimate for the discount to cover the risks and time necessary to obtain a rezoning. The record reveals that a rezoning could most probably be accomplished within 18 months. Additionally, the severe risks which petitioners contend existed regarding rezoning and the coastal commission influence were never demonstrated. We find that a 12-percent discount for the risk is reasonable. Besides technical errors, including incorrect parcel number, acreage, and topography, we find a number of flaws in Mr. Mack's original report. We question the significance of the replacement cost approach since the existing improvements occupied less than 10 percent of the Carlsbad property and as the majority of appraisers projected that the improvements would most likely be removed in order to put the parcel at its highest and best use. The market data analysis is also flawed since the report compared sales of vastly superior, newer, concrete tilt-up buildings. Additionally, Mr. Mack notes that the warehouse, 38,505 square feet, would require a site area of 1.77 acres. He then goes on to assume that 5.58 acres would be required to support the building.

This is too great an excess area calculation which leads to a significantly higher valuation.

As we discussed earlier, we do not believe that the income approach of valuation is a realistic approach to valuing the Carlsbad property. Due to the limited utility and age of the improvements, the warehouse has little utility in the existing market. In addition, we find a number of problems with Mr. Mack's income approach. First, the majority of comparable buildings were of superior quality of construction. Second, Mr. Mack deducts a 15-percent vacancy allowance, rather than deducting a discount for absorption time. This rate is a high estimate for this type of improvement. Third, Mr. Mack failed to include a reserve allowance. Fourth, the capitalization rate of 9 percent is lower than most probable considering the age, condition, and steel construction of the warehouse. Mr. Mack determined this rate by comparing rates used for completed industrial buildings. Finally, Mr. Mack considered the effect of Carlsbad's facilities management plan in his analysis even though the plan was not in existence at the date of valuation.

Finally, Mr. Mack was the least qualified expert in these cases. He was not an MAI or an SRPA designated appraiser, nor did he have ample experience appraising property in the Carlsbad area. For the above reasons, we do not feel that his valuation reflects an accurate depiction of the fair market value on the date of the gift. It seriously exaggerates the value of the property.

C. *Conclusion*

As we have observed in the past, the valuation of property is an inexact science, and if not settled by the parties is capable of resolution by the Court only through "Solomon-like" pronouncements. *Buffalo Tool & Die Manufacturing Co. v. Commissioner,* 74 T.C. at 452. We will not blindly accept valuations submitted by taxpayers where the purpose of the appraisal is to reduce tax liability. Petitioners' expert witness did not attempt to explain the over $500,000 difference between the appraisal value petitioners used when filing their gift tax returns and the value proposed at trial. In order to give serious consideration to Mr. Blackstone's much lower valuation, we would expect an explanation as to the difference. Otherwise, it appears as though he was merely acting as an

advocate for petitioners. See *Estate of Halas v. Commissioner*, 94 T.C. 570, 577 (1990).

Real estate buyers often purchase property based on its anticipated future benefits which can differ from the present use of the property. The existence of several other properties which were zoned planned industrial and fully developed on the other side of Palomar Airport Road appears to indicate the economic feasibility of industrial uses in the Carlsbad area. As petitioners' appraiser Mr. Markley noted in his report, the area around the Palomar Airport was "recognized as one of the most rapidly developing areas in North San Diego County." In addition, the Carlsbad property enjoyed an advantage over adjoining properties as it was not subject to the development restrictions imposed on agricultural land by the coastal commission.

As the valuation reports indicate, valuing the Carlsbad property as agricultural rather than industrial results in a profoundly lower value. The value of the nonindustrial zoned comparable properties which petitioners' appraisers utilized ranged from $21,318 to $31,250 per acre; whereas the industrial or commercially zoned comparables which respondent's appraisers utilized ranged from $55,000 to $386,000 per acre. The large discrepancy may be explained by what one appraiser described as significant industrial growth with stagnant residential activity in the Carlsbad area during the relevant time period.

Petitioners argued that it would be extremely difficult to rezone the Carlsbad property. They did not offer any evidence of this. Instead, respondent introduced the Carlsbad city planner who confirmed the relative ease of rezoning the property in 1985. Consequently, we look to Mr. Waldorf's comparable properties which were zoned industrial for an indication of the value of the Carlsbad property if it were successfully rezoned.

However, even if it was reasonably foreseeable that an attempt to rezone the Carlsbad property would be favorable, its value would have to be discounted due to the uncertainty associated with the rezoning process, costs, the holding period required, expenses associated with the development of a site plan for industrial development, expenses associated with the development, and the competition provided by an on-hand

inventory of improved industrial property at the time. We find that the 18-month discount used to account for the time necessary to rezone the property as well as the 12-percent discount rate utilized to obtain a zoning change are reasonable adjustments, which are necessary to compensate for industrial zoned properties in determining the fair market value of the Carlsbad property which was zoned agricultural. We are cognizant of the fact that the Carlsbad property would have been at the bottom of a long list of competitive properties which already had industrial approvals and were in more mature stages of industrial feasibility. We, therefore, look to Mr. Blackstone's report with its emphasis on continued agricultural use as a low-end figure for valuation purposes.

After reviewing the valuation reports of the parties' expert witnesses, considering their testimony, analyzing all of the other relevant evidence, and using our best judgment, we find that the fair market value of the Carlsbad property on the valuation date was $1 million. We allocate $50,000 of this to the improvements which primarily represents the net salvage value of the warehouse building and special coolers. The remaining $950,000 is allocated to the land.

Issue II: <em>The Promissory Note</em>

## A. *Background*

Having determined the fair market value of the Carlsbad property, the second issue for decision is the value of the promissory note which petitioners received as consideration for the transfer of the Carlsbad property to their children. Where property is transferred for less than adequate and full consideration, the amount by which the value of the property exceeds the consideration is a gift subject to tax. Sec. 2512(b). In other words, the difference between the value of the promissory note and the value of the Carlsbad property constitutes the gift made by petitioners to their children for gift tax purposes. Sec. 2512(b); see also secs. 25.2511-1(c), 25.2512-8, Gift Tax Regs.

It is undisputed that sections 2501 and 2511 require treatment of the $620,000 (fair market value of the Carlsbad property, $1 million, less the face amount of the promissory note, $380,000) as a taxable gift. The critical question is

whether, because the promissory note bore a below-market interest rate, there was an additional taxable gift under section 2501. We conclude that there was. When a transfer is not at arm's length and free of donative intent, a promissory note received by the donor constitutes consideration only to the extent of its fair market value. The difference between the amount lent and the fair market value of the promissory note constitutes an additional gift to the donee. *Estate of Reynolds v. Commissioner,* 55 T.C. 172, 201 (1970); *Blackburn v. Commissioner,* 20 T.C. 204 (1953); *Estate of Berkman v. Commissioner,* T.C. Memo. 1979-46.

Respondent contends that section 7872 provides the method for determining the portion of the below-market loan which constitutes a gift. We have not addressed the scope or application of section 7872 before, but rather, we have only discussed the section in dictum. See *Krabbenhoft v. Commissioner,* 94 T.C. 887 (1990) (Court reviewed), affd. 939 F.2d 529 (8th Cir. 1991); *Cohen v. Commissioner,* 92 T.C. 1039 (1989), affd. 910 F.2d 422 (7th Cir. 1990). In the alternative, respondent contends that the promissory note should be valued at $260,000, its fair market value at the time of the gift. See *Blackburn v. Commissioner, supra.*

Petitioners, citing *Ballard v. Commissioner,* 854 F.2d 185 (7th Cir. 1988), revg. T.C. Memo. 1987-128, contend that we should apply section 483(e)[4] relating to transfers of land among related parties.[5] They maintain that the use of the 6-percent interest rate pursuant to section 483 results in the promissory notes having a value of $380,000, its face amount.

In 1984 Congress enacted section 7872, which prescribes the income and gift tax treatment for certain below-market

---

[4] Originally, sec. 483(e) was enacted as sec. 483(g) and provided that, in the case of a qualified sale among family members, the discount rate used in determining the total unstated interest rate shall not exceed 7 percent. Economic Recovery Tax Act of 1981 (ERTA), Pub. L. 97-34, sec. 126(a), 95 Stat. 172, 202. Sec. 483(g) was redesignated and amended as sec. 483(f) in 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 41(b), 98 Stat. 494, 553. As part of the 1985 simplification of imputed interest rules, Congress redesignated sec. 483(f) as sec. 483(e) and amended such subsection in order to further reduce the safe-harbor interest rates for sales among related parties to 6 percent. Act of Oct. 11, 1985, Pub. L. 99-121, sec. 102(c)(1), (3), 99 Stat. 505, 508 (simplification of imputed interest rules).

[5] Sec. 483(e)(1) provides that in the case of any qualified sale, the discount rate used in determining the total unstated interest rate for purposes of sec. 483 shall not exceed 6 percent. Sec. 483(e)(2) defines qualified sale as any sale or exchange of land by an individual to a member of such individual's family (within the meaning of sec. 267(c)(4)).

interest rate loans.  Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 172(a), 98 Stat. 494, 699.  Under section 7872, a below-market loan is recharacterized as an arm's-length transaction in which the lender is treated as transferring to the borrower on the date the loan is made the excess of the issue price of the loan over the present value of all the principal and interest payments due under the loan.  Such transfer by the lender to the borrower is deemed a gift.  In effect, section 7872 requires that all loans among related parties bear an interest rate based on the then-current applicable Federal rate.  During the years at issue in these cases, the applicable Federal rate was substantially higher than the rate permitted under section 483(e).

Section 7872 does not apply to any loan to which section 483 or 1274 applies.  Sec. 7872(f)(8).  Therefore, before we address the scope of section 7872, we must first determine whether section 483 or section 1274 applies in these cases.  Sections 483 and 1274 establish two alternative interest imputation schemes for debt instruments issued in sales and exchanges of property.  Section 1274 is the general rule; it applies to a note issued in a sale or exchange unless the note is excepted from its application.  Section 483 applies to most notes excepted from section 1274.  "The principal difference between section 483 and 1274 is that the former operates on a cash basis, while the latter is an accrual regime", but both yield similar results.  Lokken, "The Time Value of Money Rules", 42 Tax L. Rev. 1, 82 (1986).

## B. *Section 483*

Since petitioners contend that section 483 provides a safe-harbor interest rate for gift tax purposes, we will first address whether section 483 is relevant for gift tax purposes.  The Commissioner has taken two contrary positions on the applicability of section 483 in cases like those before us today.  The proposed regulations published on April 8, 1986, provide that for gift tax purposes the value of a below-market debt instrument shall be determined under section 483.  Sec. 25.2512-8, Proposed Gift Tax Regs. 51 Fed. Reg. 12,098 (Apr. 8, 1986); secs. 1.1012-2(b)(1), 1.483-2(a), 1.483-4(b)(2), Proposed Income Tax Regs., 51 Fed. Reg. 12047, 12039, 12044 (Apr. 8, 1986).  Moreover, the proposed regulations specifically allow

the 6-percent safe-harbor interest rate allowed in section 483(e) for gift tax purposes. Sec. 1.483-(b)(2), Proposed Income Tax Regs., *supra*. We consider proposed regulations as no more than a litigation position, *F.W. Woolworth Co. v. Commissioner,* 54 T.C. 1233, 1265-1266 (1970), but they do constitute "a body of informed judgment to which courts may draw on for guidance". *Bolton v. Commissioner,* 694 F.2d 556, 561 n.10 (9th Cir. 1982), affg. 77 T.C. 104 (1981).

However, in General Counsel Memorandum 39,566 (G.C.M. 39,566), the Commissioner concluded that section 483 and the regulations thereunder have no relevance for gift tax purposes, and more specifically, that section 483 does not apply in calculating the gift tax in a part gift, part sale transaction similar to the transaction at issue in these cases.[6] G.C.M. 39,566 (Oct. 23, 1986). Moreover, G.C.M. 39,566 indicates that the issue before the Court today would be resolved under section 7872. Section 7872 was not directly applicable to the transaction discussed in G.C.M. 39,566 because the loan was a term loan made before June 6, 1984, the relevant effective date of section 7872. G.C.M. 39,566 was issued prior to our holdings in *Krabbenhoft v. Commissioner,* 94 T.C. 887 (1990), and *Ballard v. Commissioner,* T.C. Memo. 1987-128, but subsequent to the enactment of section 7872 and the issuance of proposed regulations thereunder. The memorandum dealt with the issue of whether the test rate provided in section 1.483-1(d)(1)(ii), Income Tax Regs., applied for valuation of a note for gift tax purposes. It did not deal directly with section 483(e).

The foregoing inconsistency demonstrates that respondent has not determined which method is appropriate to value promissory notes received in a part sale, part gift transaction within the convoluted world of time value of money. See generally Halperin, "Interest in Disguise: Taxing the 'Time Value of Money'", 95 Yale L. Rev. 506 (1986). In these cases, respondent abandons the position of the proposed regulations and adopts the approach of G.C.M. 39,566. At no point in these cases did respondent contend that section 483 applied.

---

[6]The taxpayer in G.C.M. 39,566 (Oct. 23, 1986) conveyed a farm to her children in January of 1981 in a part sale, part gift transaction receiving a note payable over a fixed term of years and bearing interest of 6 percent.

We will not rely on either the proposed regulations or the General Counsel Memorandum, but instead will decide the issue by reviewing sections 483, 1274, and 7872, the relevant legislative history of the sections, and case law.

We have addressed the relevance of section 483 for gift tax purposes on two occasions. In *Ballard v. Commissioner,* T.C. Memo. 1987-128, this Court held that the section 483 safe-harbor interest rate could not be relied on for gift tax valuation purposes. The taxpayer in *Ballard* sold property to her children for a price less than fair market value on the install-ment method at a 6-percent interest rate. In holding that section 483 was inapplicable for gift tax purposes, we reasoned that section 483 characterizes payments only as principal or interest, and was therefore irrelevant to gift tax valuation. *Id.* Section 483 was intended to prevent a seller of property under an installment plan from converting ordinary income into capital gain. This issue is irrelevant for gift tax purposes.

The Seventh Circuit reversed and held that section 483 applies to the gift tax provisions of the Code as well as the income tax provisions. *Ballard v. Commissioner,* 854 F.2d at 189. The Seventh Circuit based its holding on the introductory language of section 483 which states that section 483 applies "for purposes of this title". The court reasoned that:

although valuation of property, for purposes of gift taxes, is not directly related to the imputation of taxes on installment contracts for purposes of income taxation; a taxpayer who complies with § 483 and charges a "safe harbor" rate of interest on an installment sales contract, should not be penalized if the "safe harbor" rate of interest is below the market rate of interest for purposes of gift tax valuation. [*Id.* at 187.]

After reviewing the Seventh Circuit's reasoning in *Ballard,* we declined to follow its holding and once again held that section 483 was irrelevant for gift tax valuation purposes. *Krabben-hoft v. Commissioner,* 94 T.C. 887 (1990); see *Golsen v. Commissioner,* 54 T.C. 742 (1970).

In *Krabbenhoft,* the taxpayers sold farmland to their children under a 30-year contract for deed. In the Court-reviewed opinion, we held that the taxpayers could not utilize the interest rate used for purposes of section 483 in calculating their gift tax liability. 94 T.C. at 890; see *Cohen v. Commis-sioner,* 92 T.C. 1039, 1051 (1989). We found "nothing in the language of section 483 that indicates that [section 483] has

anything to do with valuation." 94 T.C. at 890. The Eighth Circuit affirmed our opinion in *Krabbenhoft,* holding that although section 483 applies to the entire Tax Code, section 483 is not relevant to the determination of present value for gift tax purposes. *Krabbenhoft v. Commissioner,* 939 F.2d at 532.

Application of the Seventh Circuit's opinion would lead to anomalous results. In *Ballard,* the Seventh Circuit held that an installment note that qualifies for the section 483 safe harbor should be valued at its face amount for all matters related to Federal taxation. *Ballard v. Commissioner,* 854 F.2d at 187. If this logic is applied consistently, a section 483(e) note bearing a 6-percent rate of interest that was held until the death of an intrafamily transferor would be valued for estate tax purposes at its then-remaining face value, not at its discounted present value. This would result in an estate tax on wealth that is not actually in the estate of the decedent at the date of death.

Both *Krabbenhoft* and *Ballard* involved sales made prior to the enactment of sections 483(e), 1274, and 7872. In 1981 Congress enacted current section 483(e). Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 126(a), 95 Stat. 172, 202. Section 483(e) permits the use of a safe-harbor interest rate of 6 percent on certain sales of land among related parties. We find no indication that Congress intended to amend the gift tax provisions by enactment of section 483(e). The General Explanation of the Economic Recovery Tax Act of 1981 explained the reason for the special safe harbor as follows:

> The Congress concluded that the use of a single test rate in times of unusually high interest rates placed an undue burden on sales of land between related individuals. In addition, since land is not depreciable, the buyer will prefer that more of the monthly payment be treated as a deductible interest payment rather than a non-depreciable capital investment; therefore, the Congress believed interest rates are less likely to be understated in land sales. [Staff of Joint Comm. on Taxation, General Explanation of the Economic Recovery Tax Act of 1981, at 60 (J. Comm. Print 1981).]

There is no mention of gift taxes in the explanation. Moreover, one statement made on the Senate floor is simply insufficient evidence to conclude that Congress intended section 483(e) to amend the gift tax provisions. *Halpern v. Commissioner,* 96

T.C. 895, 901-902 (1991). During the floor debate of section 483(e), Senator Jepsen noted that the safe harbor proposal would allow "parents to pass on their property to their offspring without incurring the confiscatory rates of present estate taxation." 127 Cong. Rec. 17806 (July 28, 1981). This statement can be read to imply that the intrafamily sale at fair market value would be appropriate to "freeze" the value of the property underlying the transaction for estate tax purposes, but would not preclude estate and income tax on any unpaid balance on the installment remaining at death of the transferor. See sec. 691(c); *Estate of Frane v. Commissioner,* 98 T.C. 341 (1992) (Court reviewed). However, to the extent the transfer was for less than fair market value there would, nevertheless, be a gift tax problem to the extent that the fair market value of the property sold exceeded the amount loaned, essentially the same problem which is before us in these cases.

Section 483 clearly provides a 6-percent safe harbor for intrafamily installment sales of property for income tax purposes. However, as of this date, Congress has not provided such a safe harbor for gift tax purposes. As Judge Henley noted in *Krabbenhoft,* "one must accept the proposition that Congress either intended, or else simply failed to consider, the possible 'gift tax traps' that would be created any time market rates rose above six percent." *Krabbenhoft v. Commissioner,* 939 F.2d at 534 (Henley, J., concurring).

The purpose of section 483 was thoroughly discussed in *Ballard v. Commissioner,* T.C. Memo. 1987-128. In *Ballard* we explained:

Before the enactment of section 483, an individual could sell a capital asset on the installment basis without making any specific provisions for interest payments on installments. In such cases the full difference between the cost or other basis for the property and the stated sales price usually was treated as capital gain to the seller. By structuring their sales transactions in such a manner, taxpayers would be reporting as capital gain a portion of the amount which was, in effect, interest income. * * * This manipulation of the tax laws to characterize ordinary interest income as capital gain was the specific problem Congress intended to cure when it enacted section 483.

The abuse to which section 483 was aimed is properly addressed in the gift tax context when the consideration in a part sale, part gift transaction is consistently valued under Federal gift tax principles. After reviewing all the pertinent legisla-

tion, legislative history, and case law, we continue to follow the position expressed in *Krabbenhoft v. Commissioner,* 94 T.C. at 890, and *Ballard v. Commissioner,* T.C. Memo. 1987-128, and hold that section 483(e) does not provide a safe-harbor interest rate for gift tax purposes.

## C. *Section 1274*

We now address whether section 1274 is relevant in valuing the promissory note in these cases for gift tax purposes. Section 1274 was enacted in 1984 to eliminate the perceived continued distortions caused by the mismatch of income and deductions by lenders and borrowers relating to installment sales of property. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 41, 98 Stat. 494, 531; see H. Supp. Rept. 98-432 (Part 2), at 1241-1251 (1984); S. Print 98-169, at 249-259 (1984). Congress determined that the imputed interest rates provided in section 483 did not represent economic rates of interest, and that accrual taxpayers were exploiting exceptions to the original issue discount rules to achieve deferral of income tax on interest income and accelerated deductions of interest expense. H. Supp. Rept. 98-432, *supra* at 1243-1245; S. Print 98-169, *supra* at 250-252. Therefore, a new approach utilizing the applicable Federal rate was adopted. See sec. 1274(d).

However, section 1274, like section 483, has nothing to do with gift tax valuation. The rationale behind sections 483 and 1274 is to prevent the use of below-market loans to avoid Federal income taxes in seller-financed transactions. Section 1274 modified the Federal income tax treatment of imputed interest on seller financing arising from the sale of property, but did not alter the gift tax treatment in such situations. See H. Rept. 99-87, at 1-2 (1985); Act of Oct. 11, 1985, Pub. L. 99-121, 99 Stat. 505 (simplification of imputed interest rules).

Similar to section 483, there is nothing in the language of section 1274 to indicate that the section has anything to do with valuation. Section 1274 performs two distinct roles:

First, it serves the function of section 483 of prior law by testing the adequacy of stated interest in a transaction and, where stated interest is inadequate, imputing interest. Second, it places the parties to a transaction involving nontraded debt and property on the accrual method of accounting as to any interest (whether stated or imputed) not paid currently. [Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of

the Deficit Reduction Act of 1984, at 114 (J. Comm. Print 1985); fn. refs. omitted.]

See generally Bittker & Lokken, Federal Taxation of Income, Estates and Gifts, par. 57.1, at 57-2; par. 57.4, at 57-27 (2d ed. 1990). Neither of these roles is relevant for valuation purposes. Section 1274 characterizes payments as principal or interest, "while gift tax valuation is concerned with the value of all payments, whether of principal or interest. The character of a payment does not affect its value for gift tax purposes." *Krabbenhoft v. Commissioner,* 94 T.C. 887, 890 (1990).

The effect of sections 1274 and 483 is to require a portion of the stated principal amount of the notes issued in a deferred payment sale of property to be recharacterized as interest and accrued by the buyer (as interest expense) and the seller (as interest income) over the term of the deferred payment contract. We are not concerned here with the characterization as ordinary income or capital gain of any installment payments petitioners may receive from their children.

Moreover, there is nothing in the legislative history which indicates that Congress intended any application of section 1274 for gift tax valuation purposes. Rather, in the same year in which section 1274 was enacted, Congress enacted section 7872 which expressly applies for gift tax purposes. The original issue discount rules of section 1274 and the income and gift tax rules of section 7872 are both tied to the applicable Federal interest rate. It seems implausible that Congress would enact one section which expressly applies to the situation in these cases for valuation purposes, while at the same time enacting another section which it also intended to apply for valuation purposes. The language of the sections as well as the legislative history indicates that section 7872 applies for gift tax valuation purposes, while section 1274 does not. Accordingly, we hold that section 1274 has no relevance for gift tax valuation.

D. *Section 7872*

Section 7872 was enacted in response to *Dickman v. Commissioner,* 465 U.S. 330 (1984), and the tax avoidance method of lending cash for non-interest-bearing demand notes with no income or gift tax consequences. After this Court held that interest-free demand loans did not result in gift tax liability,

the use of interest-free loans among family members enjoyed wide popularity as a tax-planning tool. *Crown v. Commissioner,* 67 T.C. 1060 (1977), affd. 585 F.2d 234 (7th Cir. 1978). In *Dickman,* the Supreme Court held that a taxpayer lending money interest free, payable on demand, made a gift of the reasonable value of the right to use that money. The Court explained that "the interest-free loan of funds is a 'transfer of property by gift' within the contemplation of the Federal gift statutes." *Dickman v. Commissioner, supra* at 338. However, the Court declined to address the methodology by which the reasonable value of the use of money should be ascertained.

Later in 1984 Congress enacted section 7872, which prescribes the income and gift tax treatment for certain below-market loans. Section 7872 goes beyond a mere codification of the *Dickman* holding. It goes beyond the intrafamily context, reaching loans to shareholders, employees, and a variety of other below-market loans. Moreover, section 7872 reaches both demand and term loans bearing an interest rate below the applicable Federal rate. In contrast to sections 483 and 1274, the language and legislative history of section 7872 make it clear that it is to apply for gift tax purposes. See sec. 7872(d)(2). The coverage of section 7872 clearly goes beyond *Dickman* to provide comprehensive treatment of below-market loans for income and gift tax purposes.

When a statute is clear on its face, we will not look beyond the language utilized by Congress in interpreting the provision. *Rubin v. United States,* 449 U.S. 424, 430 (1981); *Tele-Communications, Inc. v. Commissioner,* 95 T.C. 495, 506-507 (1990). Nowhere does the text of section 7872 specify that section 7872 is limited to loans of money. If it was implicit that it was so limited, it would be unnecessary to specify that section 7872 does not apply to any loan to which sections 483 or 1274 apply. The presence of section 7872(f)(8) signaled Congress' belief that section 7872 could properly be applicable to some seller financing. We are not here to judge the wisdom of section 7872, but rather, to apply the provision as drafted.

Under section 7872, a below-market loan is recharacterized as an arm's-length transaction in which the lender is treated as transferring to the borrower on the date the loan is made the excess of the issue price of the loan over the present value of all the principal and interest payments due under the loan.

The transfer by the lender to the borrower is deemed a gift. By enacting section 7872, Congress indicated that virtually all gift transactions involving the transfer of money or property would be valued using the current applicable Federal rate. Sec. 7872(f)(2)(B). In so doing, Congress displaced the traditional fair market methodology of valuation of below-market loans by substituting a discounting methodology. See *Blackburn v. Commissioner,* 20 T.C. 204 (1953).

Section 7872 generally applies to below-market gift term loans made after June 6, 1984. Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 172(a), 98 Stat. 494, 699. The term "loan" under section 7872 is interpreted broadly to include any extension of credit. H. Conf. Rept. 98-861, at 1018 (1984), 1984-3 C.B. (Vol. 2), 1, 272. A "term loan" is any loan which is not a demand loan. Sec. 7872(f)(6). The promissory note in these cases is a term loan as it is to be repaid on a specific date, October 1, 2005. A "below-market term loan" is a loan where the amount lent exceeds the present value of all payments due under the loan. Sec. 7872(e)(1)(B). Having determined that the loan in issue is a below-market term loan, we now turn to whether it qualifies as a gift loan.

A gift loan is a below-market loan where the forgoing of interest is "in the nature of a gift." Sec. 7872(f)(3). The question of whether the forgoing of interest is in the nature of a gift is determined under the gift tax principles of chapter 12. See sec. 7872(d)(2). Under traditional gift tax principles, we look to whether the value of the property transferred exceeds the value of the consideration received, dispensing with the test of donative intent. Therefore, a below-market loan will be treated as a gift loan unless it is a transfer made in the ordinary course of business, that is, unless it is a transaction which is bona fide, at arm's length, and free of donative intent. See H. Conf. Rept. 98-861, *supra.* As we discussed earlier, the transaction at issue was not in the ordinary course of business. Consequently, the $380,000 promissory note which petitioners received in exchange for the Carlsbad property qualifies as a gift loan under section 7872(f)(3).

Section 7872(d)(2) provides that for purposes of the gift tax provisions, subsection (b)(1) shall apply in the case of any gift term loan. Subsection (b)(1) provides that the lender shall be treated as having transferred cash on the date the loan was

made in an amount equal to the excess of the "amount loaned" over the present value of all payments under the note. Sec. 7872(b)(1)(A) and (B). "Amount loaned" is defined as "the amount received by the borrower." Sec. 7872(f)(4). In these cases we will take petitioners at their word, and treat the face amount of the loan, $380,000, as the amount received by the borrower. Pursuant to section 7872(b), the amount of the gift equals the excess of amount loaned over the present value of all payments which are required under the terms of the loan. The value of the promissory note, therefore, must be recomputed using the Federal rate for long-term loans, compounded semiannually, with quarterly payments at the time petitioners conveyed the property to their children. See sec. 7872(f)(2)(A). The face amount of the loan, $380,000 less the discounted value, results in the additional gift of interest under section 7872 which is subject to gift tax under section 2501. Sec. 7872(b). We find it anomalous that respondent urges as her primary position the application of section 7872, which is more favorable to the taxpayer than the traditional fair market value approach, but we heartily welcome the concept.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*